607 A.2d 1132

**WEST PENN POWER COMPANY, Petitioner,**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 1991.

Decided Feb. 20, 1992.

Publication Ordered April 27, 1992.

Michael D. McDowell and Alan P. Buchmann, for petitioner.

John A. Levin, for respondent.

Daniel P. Delaney, Tanya J. McCloskey and Edmund J. Berger, for intervenors.

Before CRAIG, President Judge, and DOYLE, COLINS, PALLADINO, McGINLEY, SMITH and PELLEGRINI, JJ.

PELLEGRINI, Judge.

West Penn Power Company (West Penn) files an appeal from an Opinion and Order of the Pennsylvania Public Utility Commission (PUC) which denied, in part, West Penn's request for an increase in its electric utility rates.

West Penn is an electric utility and one of three wholly owned subsidiaries of Allegheny Power Systems (Allegheny Power). West Penn generates approximately 44% of Allegheny Power's annual revenue. West Penn supplies electricity to residential, commercial and industrial customers in

23 counties in central, western, northern and southern Pennsylvania.

On March 15, 1990, West Penn filed tariff revisions designed to produce an overall increase in annual operating revenues of $56,880,000 based on the projected level of operations in the twelve months ending December 31, 1990. Complaints against the proposed tariff revisions were filed by several organizations, companies and individuals including the Office of Consumer Advocate (Consumer Advocate), Armco Advanced Materials Corporation (Armco) and Allegheny Ludlum Corporation (Allegheny Ludlum).

By Order dated April 25, 1990, the PUC suspended the proposed rates until December 15, 1990, and instituted an investigation to determine their lawfulness. The Order also directed the Office of Trial Staff (Trial Staff) to participate in the proceedings. Several evidentiary hearings were then held before Administrative Law Judge (ALJ), Larry Geoff. On October 15, 1990, ALJ Geoff issued a Recommended Decision for Exceptions which recommended an increase in West Penn's base operating revenues of $28,429,000 annually.

Exceptions were filed by several parties including Trial Staff, Consumer Advocate, Armco and Allegheny Ludlum. On December 13, 1990, the PUC issued its Opinion and Order accepting the Recommended Decision in a number of respects and modifying it in others. By that Order, the PUC authorized an increase in West Penn's annual base operating revenues of $36,170,000. West Penn, Armco and Allegheny Ludlum all filed appeals to this Court.[1]

The only issue presented in this appeal is West Penn's contention that the PUC committed an error of law by the way it determined West Penn's cost of common stock equity (cost of equity) for purposes of establishing a fair rate of return for West Penn's investors.

1. The appeals of Armco and Allegheny Ludlum are docketed at 118 C.D. 1991 and 100 C.D. 1991 respectively. The issues involved in those appeals are not before us here.

The overall rate of return for West Penn was established by determining the cost of the three basic components of its capital structure: Long–Term Debt, Preferred Stock and Common Stock Equity. The only determination that West Penn disputes is the cost of equity. At the hearings before the ALJ, West Penn, Consumer Advocate and Trial Staff all presented evidence as to West Penn's cost of equity.[2]

West Penn submitted cost of equity figures to the ALJ based on three methods: the Discounted Cash Flow (DCF) [3] method, the Equity Risk Premium (RP) [4] method and the Comparable Risk (CR) [5] method. West Penn's calculations for its cost of equity were 11.9% using the DCF method, 14.6% using the RP method and 14.9% using the CR method. West Penn then averaged the three results for a figure of 13.8% as their cost of equity. (Reproduced Record (R.R.) 592a–593a).

Consumer Advocate submitted cost of equity figures

**2.** Since West Penn's stock is wholly-owned by Allegheny Power and not publicly traded, the parties utilized the financial figures of Allegheny Power or comparable companies in making their calculations of cost of equity under the various methods.

**3.** The DCF method calculates the cost of equity by dividing the amount of dividends per share by the market price per share and then adding this amount to the assumed growth rate in the future price of the stock or dividends. The basic theory behind the DCF method is that the market price an investor pays for a share of stock represents the present value of the investors expected future cash flows from both dividend yields and market value appreciation. *See* J. Cawley & N. Kennard: The Rate Case Handbook: A Guide to Utility Ratemaking Before the Pennsylvania Public Utility Commission (Rate Case Handbook) 242–50 (1983) with excerpts from R. Hahne & G. Aliff, Accounting for Public Utilities (1983).

**4.** The RP method calculates the cost of equity as the sum of a recent rate of return on risk free securities, i.e., Long-term U.S. government bonds, and a "risk premium," the differential between the rates of return on the risk free securities and the rates of return on the utilities common stock over a long period of time. *See* Rate Case Handbook, *supra* note 3 at 254–56.

**5.** The CR method calculates the cost of equity by comparing market price to either net book equity, earnings per share or dividends per share for several companies. *See* Rate Case Handbook, *supra* note 3 at 240–42. West Penn utilization of the CR method involved comparing the expected returns of the Standard & Poor's index of 500 industrial stocks. (Reproduced Record (R.R.) 593a).

based on four methods: DCF, the Earnings/Price (E/P)[6] method, the Capital Asset Pricing Model (CAPM)[7] method and the Market-to-Book Ratio (MTB)[8] method. Consumer Advocate's calculations for West Penn's cost of equity were 11.13% using the RP method, 11.62–11.67% using the E/P method, 11.79% using the CAPM method and 11.00–11.13% using the MTB method. (R.R. 592a, 594a–595a). Trial Staff also submitted a cost of equity proposal to the ALJ utilizing the DCF method. The Trial Staff's calculation under the DCF method was 10.85–11.76%. (R.R. 592a–594a).

In his Recommended Decision, the ALJ reviewed the positions of West Penn, Consumer Advocate and Trial Staff and arrived at a cost of equity of 11.55%. The ALJ accepted the various parties' figures under the DCF method and rejected the proposed figures under the RP, CR and CAPM methods. (R.R. 595a). The ALJ arrived at the 11.55% cost of equity figure by averaging the dividend yields proposed under the DCF method employed by each party for a figure of 7.8%. The ALJ then added a projected 3.5% growth rate to arrive at a 11.3% figure. He then added a 25 basis point adjustment, .25%, to arrive at a 11.55% cost of equity. This adjustment was made to compensate West Penn for the higher regulatory risk it encounters by being subject solely to the regulation of Pennsylvania than the jurisdictionally diversified regulatory risk of its parent, Allegheny Power, whose operations include three utilities spanning five states.

6. The EP method calculates the cost of equity by dividing the expected earnings per share, i.e., the dividend, by the current market price per share. *See* Rate Case Handbook, *supra* note 3 at 236–40.

7. The CAPM is a more sophisticated version of the RP method and calculates the cost of equity by adding the rate of return for risk free securities to the utilities "beta," or measure of the volatility of its stock relative to the market as a whole (usually utilizing the data from the S & P 500), multiplied by the difference between the rate of return on risk free securities and the expected rate of return on securities in the market as a whole. *See* Rate Case Handbook, *supra* note 3 at 251–53.

8. The MTB method is a method derived from the DCF method and seeks to determine the cost of equity capital using market-determined parameters. (R.R. 220a–202a).

The PUC in reviewing the Exceptions to the ALJ's Recommended Decision rejected the ALJ's approach of averaging the results of the various parties' proposals under the DCF method stating:

[a]lthough averaging [of dividends and growth rates under DCF] may offset possible risk differences among the barometer groups [other utilities or companies] plus possible aberrations in the witnesses' judgment, *averaging also dilutes any witness's judgment that is based upon sound financial and economic analysis of the prevailing evidence.*

(R.R. 596a). (Emphasis added.)

The PUC agreed, however, with the ALJ's acceptance of the DCF method as the superior method finding that an analysis employing the DCF method and using the financial data of Allegheny Power, rather than the financial data of barometer groups used for other methods, would best arrive at a appropriate figure for West Penn's cost of equity. After reviewing the parties proposed figures under the DCF method, the PUC found that Trial Staff's recommendation of a cost of equity figure of 11.76% using Allegheny Power's financial data was the most theoretically correct version of the DCF method presented by the parties. The PUC found that the Trial Staff calculation under the DCF method was superior because Trial Staff used dividend yields which were readily accessible to the typical investor and added stability and balance to that portion of the DCF equation and because of adjustments Trial Staff made using a projected growth rate to arrive at an expected dividend yield.

The PUC also agreed with the ALJ's conclusion that West Penn has a higher regulatory risk than Allegheny Power and an adjustment must be made to the final figure to compensate West Penn for this added risk. Therefore, the PUC added the ALJ's recommended 25 basis point adjustment for increased regulatory risk to arrive at a figure of 12.01%. The PUC then also added an additional 25 basis points to reward West Penn stockholders for installing a

management team which had exhibited an outstanding record of promoting efficient operations, arriving at a final figure 12.26% which it rounded to 12.30%.

West Penn contends that the PUC committed an error of law by relying solely on the DCF method when it determined the cost of West Penn's common equity to be 12.3%. West Penn argues that the DCF model does not reflect reality and is designed to reduce the market price of West Penn's stock and therefore should not be the sole basis to determine cost of common equity. West Penn contends that the PUC should have averaged the DCF results with those of the two other methods that it put forth, the RP and CR methods, to arrive at a cost of equity of 13.8%.

In its brief, West Penn conducts a theoretical analysis of the DCF method attempting to show that the method is fundamentally flawed and should only have been considered in combination with the RP and CR methods. West Penn adamantly argues that the rate of return established by the PUC using the DCF method will drive the price of Allegheny Power's common stock to book value. West Penn contends that this will undermine Allegheny Power's financial integrity, drive away investors and make it impossible to raise capital which violates the United States Supreme Court's pronouncement in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944), that the return on equity should assure confidence in the financial integrity of the utility and enable it to attract capital. West Penn argues that it is vital that Allegheny Power be able to raise capital because it must raise between 1.5 and 2 billion dollars in order to comply with the recent amendments to the Clean Air Act.[9]

Although West Penn sets forth a viable argument for choosing its averaging approach as opposed to the exclusive use of the DCF method, the decision on which approach to use is not for this Court to make. As long as there is a rational basis for the PUC's methodology, such decisions are left entirely up to the discretion of the PUC which,

9. 42 U.S.C. § 7401 *et seq.*

using its expertise, is the only one which can properly determine which method is the most accurate given the particular circumstances of the case and economic climate.

It is well settled that the establishment of a rate structure, and consequently the establishment of the cost of equity to be included in the rate base of that structure, is an administrative function peculiarly within the expertise of the PUC. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 106 Pa. Commonwealth Ct. 437, 526 A.2d 1243 (1987) *petition for allowance of appeal denied*, 517 Pa. 628, 538 A.2d 880 (1988); *T.W. Phillips Gas & Oil Company v. Pennsylvania Public Utility Commission*, 81 Pa. Commonwealth Ct. 205, 474 A.2d 355 (1984); *Philadelphia Electric Company v. Pennsylvania Public Utility Commission*, 79 Pa. Commonwealth Ct. 445, 470 A.2d 654 (1984).

When determining the cost of capital, the PUC must "give consideration to the utilities financial structure, credit standing, dividends, interests, risks, regulatory lag, wasting assets and any peculiar features of the utility involved." *Lower Paxton Township v. Pennsylvania Public Utility Commission*, 13 Pa. Commonwealth Ct. 135, 141, 317 A.2d 917, 921 (1974). "Because of these many variables, the cost of capital is basically a matter of judgment governed by the evidence presented and the regulatory agency's expertise." *Id.*

Moreover, the PUC is granted a wide range of discretion as to the extent and type of adjustments it makes to a utilities rate base and these discretionary findings must be accepted unless they are totally without support in the record. *Philadelphia Electric Company v. Pennsylvania Public Utility Commission*, 93 Pa. Commonwealth Ct. 410, 502 A.2d 722 (1985); *UGI Corporation v. Pennsylvania Public Utility Commission*, 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980).

Where the PUC makes a finding or determination which is within its discretion, this Court must not disturb

that order except for an error of law, lack of evidence to support the findings, or a violation of constitutional rights. *Hercik v. Pennsylvania Public Utility Commission*, 137 Pa. Commonwealth Ct. 377, 586 A.2d 492 (1991); *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission*, 137 Pa. Commonwealth Ct. 282, 585 A.2d 1151 (1991). We will not substitute our discretion for the discretion properly exercised by the PUC. *Norfolk and Western Railway Co. v. Pennsylvania Public Utility Commission*, 489 Pa. 109, 413 A.2d 1037 (1980); *W.C. McQuaide.*

A review of the evidence presented by Trial Staff demonstrates that substantial evidence exists to support the PUC findings regarding the method and figures it chose to use. West Penn presented evidence to the ALJ regarding the accuracy of the different methods and the considerations that went into them such as the future expenditures Allegheny Power faces to comply with the Clean Air Act. Consumer Advocate and Trial Staff also presented evidence on the various methods and the factors they took into consideration in arriving at their figures.

In arriving at a cost of equity for West Penn, the PUC used its expertise to review this evidence to determine which method would result in the most accurate figure representing cost of equity to West Penn. The PUC reviewed the evidence presented by the experts and came to the conclusion that the DCF method was the best method to calculate West Penn's cost of equity based on the circumstances and economic climate. The PUC also determined that of all the estimates made by the parties using the DCF method, the calculations made by Trial Staff were the most accurate. The PUC used the Trial Staff's figure and adjusted it upward for additional risk and efficient management.

The PUC has the discretion to make the decision of which method or methods it will rely on to calculate a reliable cost of equity. The PUC has the expertise to make an informed judgment regarding which method is proper for the circumstances of the particular case, be it the economic conditions in general or the peculiar nature of the particular utility.

Because it was within the PUC's discretion to determine the method to be used and substantial evidence exists to support their findings, we will not disturb their Order.

Accordingly, we will affirm the PUC's Opinion and Order.

## ORDER

AND NOW, this 20th day of February, 1992, the Opinion and Order of the Pennsylvania Public Utility Commission dated December 14, 1990, is affirmed.