**UNITED STATES STEEL CORPORATION,**
Petitioner

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2003.
Decided May 10, 2004.
As Amended May 12, 2004.

Pamela C. Polacek, Harrisburg, for petitioner.

Shane M. Rooney, Harrisburg, for respondent.

Thomas P. Brogan, Harrisburg, for intervenor, Reliant Resources, Inc.

BEFORE: COLINS, President Judge, McGINLEY, Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, COHN, Judge, and SIMPSON, Judge.

OPINION BY Judge PELLEGRINI.[1]

United States Steel Corporation (U.S.Steel) petitions from an order of the Pennsylvania Public Utility Commission (Commission) granting Duquesne Light Company's (Duquesne) petition and concluding, *inter alia*, that a Generation Avoidance Energy (GAE) provision in Duquesne's High Voltage Power Service (HVPS) rate class does not violate the rate cap protections in Section 2804(4)(ii) of the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. § 2804(4)(ii).[2]

Duquesne is a Commission-regulated public utility that transmits and distributes electricity to retail customers, including U.S. Steel, a Pennsylvania corporation engaged in the production and sale of steel. On December 21, 1987, the Commission approved an amendment to Duquesne's tariff to include a new HVPS rate class, which included a provision for the supply of GAE.[3] Duquesne is the only electric distribution company that has the HVPS rate class, and since 1987, Duquesne and U.S. Steel have entered into the GAE rate.[4] Apparently, since the adoption of the HVPS rate class, U.S. Steel has had a standing order for GAE, and Duquesne has sold GAE to U.S. Steel whenever such supply was physically available in a given month, even when Duquesne had to pur-

---

1. This opinion was reassigned to the author on March 30, 2004.

2. Section 2804(4)(ii) provides:

   In addition to the rate cap set forth in paragraph (i), for a period of nine years from the effective date of this chapter or until an electric distribution utility is no longer recovering its transition or stranded costs through a competitive transition charge or intangible transition charge and all customers of an electric distribution utility can choose an alternative provider of electric generation, whichever is shorter, the generation component of a utility's charges to customers who purchase generation from the utility, including the competitive transition charge and intangible transition charge, shall not exceed the generation component charged to the customers that has been approved by the commission for such service as of the effective date of this chapter.

3. GAE provides customers that have the capability of generating their own electricity the option of purchasing electricity from Duquesne at a rate lower than the standard HVPS rate so that they may avoid more expensive self-generation costs. On the face of the tariff itself, GAE is listed as an "option,"

along with stating when such energy is available for purchase. Specifically, the GAE provision provides:

   Generation Avoidance energy provides an option to customers who produce electricity for their own use by utilizing their own internal generating equipment. The customer may purchase energy in excess of that contracted for on this rate and avoid the increased use of alternate energy sources.
   Prior to the start of each billing month, the customer must inquire as to the availability of generation avoidance energy for the billing month. When generation avoidance energy is available, the Company and the customer will mutually establish the demand threshold for generation avoidance energy. All kilowatt-hours in any 15 minute on-peak metered period that exceed the monthly stipulated demand level will be considered generation avoidance energy. Generation Avoidance energy will be billed at the average base rate price resulting from the charges calculated for the demand and energy under this rate.
   (Reproduced Record at 18a.)

4. U.S. Steel is the only entity to which the GAE rate currently applies.

chase additional electricity from another supplier.

In 2000, as a consequence of its 1998 restructuring settlement, Duquesne auctioned its generation assets to Orion Power Holdings, Incorporated (Orion). However, Duquesne was still required by the Public Utility Code to serve as a provider of last resort for all generation service to those distribution customers that did not purchase electricity from an alternative supplier. *See* 66 Pa. C.S. .§ 2807(e). In order to meet this obligation, Duquesne and Orion entered into a generation·supply agreement on September 24, 1999 (POLR I Agreement). Under the POLR I Agreement, Orion was to provide generation service to all non-shopping Duquesne customers until the conclusion of the transition period for every rate class, currently January 1, 2005, and the term of every then-existing special contract. In addition, Duquesne acquired the generation supply that it needed from Orion to fulfill its provider of last resort obligations. The POLR I Agreement called for Orion to be paid for generation service according to the terms and conditions that existed under Duquesne's tariff, i.e., the discounted GAE rate.

First evidenced in a letter dated May 22, 2001, Orion began objecting to Duquesne's practice of providing U.S. Steel with GAE and, in turn, paying Orion at the GAE rate. Orion asserted that the decision to provide GAE rested with it and not Duquesne. Duquesne believed that its tariff obligated it to provide GAE to U.S. Steel at the discounted rate and, therefore, that Orion was also obligated to provide GAE at the discounted rate under the terms of

the POLR I Agreement. Orion was later acquired by Reliant Resources, Incorporated (Reliant) in February of 2002.[5]

On October 25, 2002, Duquesne filed a petition for declaratory order asking the Commission to hold that it had been correctly interpreting the GAE provision of the HVPS rate schedule. Duquesne's application of the GAE provision was objected to by Reliant, and the Commission's Office of Trial Staff (OTS) and Reliant filed answers opposing Duquesne's tariff interpretation. In its answer, Reliant argued that pursuant to the tariff language, it has the ability to determine if and when GAE will be available to U.S. Steel. U.S. Steel also filed answers in the matter in support of Duquesne's tariff interpretation.

On February 6, 2003, the Commission issued an order granting Duquesne's petition for declaratory order, but rejecting its interpretation of the GAE provision. Rather, the Commission endorsed the tariff interpretation advocated by Reliant finding that Duquesne's interpretation was not just and reasonable as required by Section 1301 of the Public Utility Code (Code), 66 Pa.C.S. § 1301.[6] In interpreting the tariff, the Commission found that it was an option to only be exercised when it was in the best interest of both parties and, in addition, it did not require that it had to be sold below the tariff rate available to other suppliers anytime there was power available. Specifically, it stated:

> We now turn to the actual language at issue here. First, we note that the tariff requires that the customer "must inquire as to the availability of generation avoidance for the billing month." The

---

**5.** Reliant is a corporation that sells electricity at wholesale throughout the United States to various entities, including Duquesne.

**6.** Section 1301 provides, in relevant part:

> Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission.

tariff language contemplates that Generation Avoidance energy may not be available at all in some circumstances, and that its availability will vary on a month to month basis. Duquesne and U.S. Steel insist that Generation Avoidance energy is available whenever there is some power for sale that can be transmitted and distributed to U.S. Steel facilities. In effect, they are asserting that power only would be unavailable if every kilowatt of generation that could be transmitted and distributed to the customer was already under contract or otherwise accounted for (i.e., unavailable due to plant maintenance, etc.)

It is hard to believe that this type of scenario is what Duquesne envisioned when it filed its tariff supplement in 1987. As noted previously, Duquesne had significant generation resources at that time and was concerned that it would lose a large portion of its industrial load. Duquesne had no expectation that it was going to find enough customers in its service territory for every known kilowatt of its available generation then and for the foreseeable future. If they had had such an expectation, Duquesne never would have proposed the creation of the HVPS rate class. Why would a utility, on its own initiative, create a discounted rate when the demand for generation equaled or exceeded supply? In fact, Duquesne was concerned that some of its generation capacity would be idled due to a declining customer base. The more reasonable interpretation of this tariff language, therefore, is that Generation Avoidance was meant to be available when it was in the economic interest of both the customer and the supplier, and not simply when it was physically available.

Second, Duquesne's interpretation would also lead to extreme results in certain circumstances that would not be in the interest of the public. One can envision a scenario, during a time of an energy emergency, for example, where a generation supplier would be required to provide Generation Avoidance power to U.S. Steel at prices grossly below market rates month after month, even to the point of severe financial harm. We do not believe that either Duquesne or Orion/Reliant agreed to undertake such a risk when Duquesne filed this tariff supplement or they entered into the POLR 1 Agreement.

We must also consider a hypothetical situation where Reliant did not fulfill its obligations under the POLR 1 Agreement. The Commission was previously faced with a similar situation due to the bankruptcy of New Power Holdings, Inc. In such an event, U.S. Steel would be presented with the option of either acquiring all of its generation from an alternative supplier at market rates or requiring Duquesne, as a provider of last resort, to supply generation under the terms of the HVPS rate class of its tariff. U.S. Steel would likely prefer to acquire a portion of its energy needs from Duquesne at the discounted Generation Avoidance rate. As Duquesne has no generation assets of its own, it would, thus, have to obtain power on the open market to meet U.S. Steel's needs. Duquesne would incur a financial loss with every such transaction. It is unclear how Duquesne would recover, if ever, the costs of these Generation Avoidance purchases. It would not seem consistent with the goals of electric reliability and universal service to impose this type of financial burden on one of our providers of last resort in order to bestow a subsidy to a limited number of customers.

Finally, we note that the tariff provision states that "a mutually agreeable demand threshold" must be reached every month for the provision of Generation Avoidance energy. What would happen if the parties cannot arrive at a "mutually agreeable" threshold? Presumably no Generation Avoidance energy would then be provided. The possibility that Generation Avoidance could not be provided militates against Duquesne and U.S. Steel's interpretation of the tariff. If Generation Avoidance energy must really be made available whenever it is demanded, then U.S. Steel should be able to unilaterally set a demand threshold. However, the tariff provision expressly states that the demand threshold must be "mutually" set. This language strongly suggests that economic considerations *are* a factor in whether Generation Avoidance is available, and that its provision is at the discretion of the supplier.

(Commission's February 6, 2003 Order at 14–16.) The Commission ultimately concluded that:

> [T]he just and reasonable interpretation of the [GAE] provision of Duquesne's tariff is that such energy is to be provided at the discretion of the generation supplier. Reliant, as the generation supplier for Duquesne's distribution customers, cannot be compelled to provide such service to members of the HVPS rate class. Duquesne is not obligated to provide [GAE] either.

(Commission's February 6, 2003 Order at 17.)

On February 21, 2003, U.S. Steel filed a petition for reconsideration, rescission and amendment (Reconsideration Petition). On May 1, 2003, the Commission denied U.S. Steel's request to reconsider and reverse its prior order and affirmed the February 6th order in its entirety. U.S. Steel petitioned this Court arguing that the Commission's decision: (1) violates the rate cap protections in Section 2804(4)(ii) of the Competition Act; (2) misapplied the "just and reasonable" rate standard in Section 1301 of the Code, 66 Pa.C.S. § 1301; (3) allowed a non-jurisdictional, wholesale supplier to determine service terms for a jurisdictional, retail customer; (4) failed to adequately consider the economic impact of its decision; (5) ignored the plain language of Duquesne's tariff and over 15 years of its consistent application; (6) issued orders not supported by substantial evidence; and (7) failed to conduct an evidentiary hearing.[78]

---

**7.** This Court's review of a Commission's adjudication is prescribed in Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704. It provides that the Court shall affirm unless it determines that the adjudication is in violation of constitutional rights, that it is not in accordance with law, that provisions relating to practices of Commonwealth agencies in Sections 501–508 of the Administrative Agency Law, 2 Pa.C.S. §§ 501–508, have been violated or that any necessary finding of fact is not supported by substantial evidence. *See also George v. Pennsylvania Public Utility Commission*, 735 A.2d 1282 (Pa.Cmwlth. 1999), *petition for allowance of appeal denied*, 563 Pa. 650, 758 A.2d 1202 (2000).

**8.** Reliant argues that because U.S. Steel did not file a petition for review of the Commission's February 6, 2003 order within the 30 day time limit, only the Commission's May 1, 2003 order denying reconsideration is properly before this Court. However, when a party timely files a petition for reconsideration and the trial court or administrative tribunal grants reconsideration within the 30 day appeal period, the lower tribunal retains jurisdiction to rescind, amend or affirm its previous order, and the appeal period does not commence until the entry of a new order after reconsideration of the merits of the original order. Pa. R.A.P. 1701(b)(3); *see* 2 G. Ronald Darlington et al., Pennsylvania Appellate Practice §§ 1701:21—1701:27 (2d ed.2002); *Barron v. City of Philadelphia*, 754 A.2d 738

■ Initially, we note that as the administrative agency charged with regulating utilities under the Code, 66 Pa.C.S. §§ 101–3316, the Commission has a particular expertise in interpreting its utility tariffs, and its expert interpretation of those issues is entitled to great deference and should only be reversed if clearly erroneous. *Aronson v. Pennsylvania Public Utility Commission*, 740 A.2d 1208 (Pa. Cmwlth.1999), *petition for allowance of appeal denied*, 561 Pa. 700, 751 A.2d 193 (2000). While, admittedly, there may be more than one plausible interpretation of the GAE provision, we stress from the outset that we may only reverse if the Commission's interpretation was *clearly* erroneous.

■ U.S. Steel first contends that the Commission's interpretation of the GAE provision violates the rate cap protections in Section 2804(4)(ii) of the Competition Act because it requires U.S. Steel to pay a greater cost for the generation component of its electricity purchases. Section 2804(4)(ii) of the Competition Act was enacted to prevent utilities from increasing customer rates by changing the tariffs that existed at the time of the passage of the Act. However, that is not the case here as the Commission's order *did not change or eliminate* any of Duquesne's HVPS tariff

provisions, nor did it *force* U.S. Steel or Duquesne to break rate caps; instead, it simply *applied the plain language* of a lawfully filed tariff that pre-dates the Competition Act.[9] In fact, under the Commission's interpretation, U.S. Steel is still eligible to receive GAE energy so long as the parties agree on the terms of the transaction. Essentially, the Commission's order makes GAE energy an option, not a right. Because the Commission's order only interpreted the language of a GAE provision adopted prior to the enactment of the Competition Act, i.e., it did not alter, change or eliminate the language of the provision, the Commission's decision did not violate Section 2804(4)(ii) of the Competition Act.

■ Next, U.S. Steel contends that the Commission misapplied the "just and reasonable" rate standard in Section 1301 of the Code because Reliant is a non-jurisdictional, wholesale electricity supplier and, therefore, is not subject to the Commission's jurisdiction because it is not a "utility" as defined under the Code.[10] Although the Commission did set forth the "just and reasonable" standard, from a reading of its opinion, it is evident that any application of that standard was nominal at best.[11] In applying the standard, we note

(Pa.Cmwlth.), *petition for allowance of appeal denied*, 563 Pa. 691, 760 A.2d 856 (2000). The Commission granted reconsideration of its February 6 order on March 6, within the 30 day time limit for filing a petition for review. Thus, the merits of that order are properly before this Court.

9. Even Duquesne admits that this issue does not involve rate caps under Section 2804(4) because all of the rates that could be applicable to U.S. Steel under Duquesne's tariff had been approved by the Commission as of the 1997 effective date of the Competition Act. (*See* Reply of Duquesne Light Company in Support of Its Petition for Declaratory Order ¶ 22; Reproduced Record at 119a.)

10. The Code defines "Public Utility," in relevant part, as follows:

> Any person or corporations ... owning or operating in this Commonwealth equipment or facilities for producing, generating, transmitting, distributing or furnishing ... electricity ... to or for the public compensation.
> 66 Pa.C.S. § 102.

11. Most likely, the Commission did not conduct a thorough just and reasonable analysis because it determined that it was not necessary. Section 1301 of the Code sets forth the general standard that in ratemaking, the final rates are to be just and reasonable; however, this case does not deal with setting new rates.

that the Commission's decision only discussed the standard in relation to Duquesne's interpretation of the tariff, not Reliant's. (Commission's February 6, 2003 decision at 10.) ("Duquesne's interpretation of its tariff must be just and reasonable.") Moreover, Reliant's economic interests do not appear to have been a major factor in reaching the Commission's final decision.[12]

■ U.S. Steel also contends that the Commission failed to adequately consider the economic impact of its decision on U.S. Steel and the public. In so contending, U.S. Steel requests this Court to reweigh historical, economic and policy factors that informed the Commission's decision. When the Commission disposes of an issue involving its special expertise and requiring the exercise of discretionary judgment, absent an error of law or total lack of supporting evidence, the Court will not substitute its judgment for that of the Commission. *West Penn Power Company v. Pennsylvania Public Utility Commission*, 147 Pa.Cmwlth. 6, 607 A.2d 1132 (1992), *petition for allowance of appeal denied*, 539 Pa. 661, 651 A.2d 547 (1993);

*Kossman v. Pennsylvania Public Utility Commission*, 694 A.2d 1147 (Pa.Cmwlth. 1997).[13]

■ Finally, U.S. Steel contends that its due process rights were violated when the Commission failed to conduct an evidentiary hearing. First, we note that no party requested an evidentiary hearing in the initial pleadings. Second, the Commission explained that it decided the case solely upon an interpretation of the GAE provision and did not need to resolve disputes of material fact. Specifically, the Commission needed to decide what was meant by the phrase—"When [GAE] is available, the Company and the customer will mutually establish the demand threshold for [GAE]." (Reproduced Record at 18a.) That is a legal question upon which no findings of fact need to be made.[14] Under that circumstance, it correctly determined that an evidentiary hearing was not required. *See West Penn Power Company v. Pennsylvania Public Utility Commission*, 659 A.2d 1055 (Pa.Cmwlth.1995).

Because the Commission's interpretation of the GAE provision was reasonable and

---

The established rate in the HVPS tariff was set when it was adopted, and the issue before the Commission turned on applying the existing tariff, not on setting rates.

12. The Commission's power to fix just and reasonable rates requires the agency to make and apply policies concerning the appropriate balance between prices charged to retail customers and returns on capital to utility investors consonant with constitutional protections. *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Company (Water Division)*, 492 Pa. 326, 424 A.2d 1213 (1980), *writ of certiorari denied*, 454 U.S. 824, 102 S.Ct. 112, 70 L.Ed.2d 97 (1981).

13. Related to this argument is U.S. Steel's contention that the Commission's decision: (1) ignored 15 years of consistent application by Duquesne and U.S. Steel of the GAE provision; and (2) allowed Reliant to determine service terms for Duquesne. However, the

fact that Duquesne and U.S. Steel allegedly had a history of interpreting the tariff differently is of no legal relevance. A tariff must be applied consistent with its language and not according to any private understanding. 66 Pa.C.S. § 1303; *Byer v. Peoples Natural Gas Company*, 251 Pa.Super. 75, 380 A.2d 383 (1977). Moreover, the Commission's interpretation that GAE need only be supplied when available and only when the parties "mutually establish" the terms of the transaction is sound. In essence, the Commission found that because Reliant supplies all of Duquesne's power, Duquesne cannot make the determination of availability of power without Reliant's consent.

14. For the same reason, we find that the Commission's orders were supported by substantial evidence.

consistent with the Competition Act, the Commission did not err in its plain language analysis of the tariff language.

Accordingly, the orders of the Commission are affirmed.

Judge LEADBETTER did not participate in the decision of this case.

Judge SIMPSON dissents.

### ORDER

AND NOW, this *10th* day of *May,* 2004, the Order of the Pennsylvania Public Utility Commission, No. P–00021989, dated February 6, 2003, and its Order on Reconsideration, dated May 1, 2003, are affirmed.

### DISSENTING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from the majority's decision to affirm the order of the Public Utility Commission (Commission) when it results in a direct violation of the rate-cap protections contained in Section 2804(4)(ii) of the Electricity Generation Customer Choice and Competition Act (Competition Act), 66 Pa.C.S. § 2804(4)(ii). The "Generation Avoidance Energy" (GAE) provision included in Duquesne Light Company's "High Voltage Power Service" (HVPS) rate class, unaltered since its approval by the Commission in 1987, provides:

> Generation Avoidance energy provides an option to customers who produce electricity for their own use by utilizing their own internal generating equipment. The customer may purchase energy in excess of that contracted for on this rate and avoid the increased use of alternate energy sources.

> Prior to the start of each billing month, the customer must inquire as to the availability of generation avoidance energy for the billing month. When generation avoidance energy is available, the Company and the customer will mutually establish the demand threshold for generation avoidance energy. All kilowatt-hours in any 15 minute on-peak metered period that exceed the monthly stipulated demand level will be considered generation avoidance energy. Generation Avoidance energy will be billed at the average base rate price resulting from the charges calculated for the demand and energy under this rate.

Petition of Duquesne (Exhibit A); R.R. 18a.

The manner is which Duquesne and U.S. Steel have interpreted and applied the GAE provision for some fifteen years is not seriously contested. Each month, some agreed upon amount of electricity was provided to U.S. Steel at the lower GAE rate, so long as such energy was physically available and even if in supplying the energy Duquesne was obligated to purchase additional energy from another supplier. On a monthly basis, U.S. Steel provided Duquesne with the necessary information regarding its load requirements and the amount of its own generation available, thereby allowing for the establishment of a demand threshold over which U.S. Steel would be charged the lower GAE rate. It is evident from the record that the arrangement was in effect in December 1987 when the Commission approved the HVPS rate class, which included the GAE provision; in May 1998 when the Commission approved Duquesne's restructuring plan at which time the Commission included in its order a specific requirement that Duquesne maintain the GAE provision; in September 1999 when Duquesne and Orion entered into the generation supply agreement (POLR I Agreement) whereby Orion would provide service to all "non-shopping" Duquesne customers until January

1, 2005; and in 2000 when Duquesne sold its generation facilities to Orion.

After selling its generation facilities, Duquesne continued to supply GAE to U.S. Steel in accordance with the procedures established in 1987, billing U.S. Steel and paying Orion for that electricity at the lower GAE rate. This longstanding application of the GAE provision went unchallenged until May 2001 when, months after acquiring Duquesne's generation facilities, Orion objected to supplying the lower-rate GAE to U.S. Steel and asserted that GAE was available at Orion's sole discretion. Reliant later acquired Orion and reiterated the objection and has repeatedly stated that GAE will no longer be made available to U.S. Steel.

The Commission's decision will require U.S. Steel to pay a greater cost for the generation component of its electricity purchases while U.S. Steel is still paying Duquesne for its "transition or stranded costs" as defined in Section 2803 of the Competition Act, 66 Pa.C.S. § 2803, thus violating rate-cap protections in Section 2804(4)(ii) of the Competition Act.[1] Section 2804(4)(ii) provides:

> In addition to the rate cap set forth in subparagraph (i), for a period of nine years from the effective date of this chapter or until an electric distribution utility is no longer recovering its transition or stranded costs through a competitive transition charge or intangible transition charge and all customers of an electric distribution utility can choose an alternative provider of electric generation, whichever is shorter, the generation component of a utility's charges to customers who purchase generation from the utility, including the competitive transition charge and intangible transition charge, shall not exceed the generation component charged to the customers that has been approved by the commission for such service as of the effective date of this chapter.

Neither Reliant nor the Commission seriously disputes that if the Commission's interpretation stands, GAE will cease to exist and the charge U.S. Steel pays for the generation component of its electricity purchases will "exceed the generation component charged to the customer[] that has been approved by the commission for such service as of the effective date of this chapter." *Id.*

The Commission's suggestion that it has not invalidated the GAE provision and that GAE is still available if the parties can agree on the terms of their transactions is contradicted by Reliant's unequivocal statement that GAE is not now available to U.S. Steel and will not be available to it in the future. The Commission's interpretation of the GAE provision eviscerates the provision just as effectively as if the Commission had ordered the GAE provision excised from Duquesne's tariff. To assert otherwise is to elevate form over substance. *See Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission,* 808 A.2d 1044 (Pa.Cmwlth.2002). The real issue, in fact, is whether Section 2804 of the Competition Act prohibits such an outcome when the increase in charges for the generation component of electricity purchases is the result of the Commission's newly formulated interpretation of an approved tariff provision. Finding nothing in Section 2804 or in any other section of the Competition Act that would exclude such a decision from the purview

---

1. Duquesne estimates that if GAE is eliminated, U.S. Steel will face increased costs to purchase electricity in the range of $7,000,000 to $9,000,000 per year, although not all of that increase would be attributable to an increase in the cost of the "generation component" referred to in Section 2804(4)(ii) of the Competition Act.

of Section 2804 rate-cap protections, on the facts here, I conclude that the Commission's after-the-fact interpretation of the GAE provision violates the rate-cap protections.[2] *See Commonwealth v. Stanley,* 498 Pa. 326, 446 A.2d 583 (1982) (clear statutory language must be read in accordance with its plain meaning and common usage).

In so concluding, I remain aware that the Commission's interpretations of its governing statutes and regulatory pronouncements and the terms of lawfully approved tariffs are entitled to great deference. *Aronson v. Pennsylvania Public Utility Commission,* 740 A.2d 1208 (Pa. Cmwlth.1999). When the Commission disposes of an issue involving its special expertise and requiring the exercise of discretionary judgment, absent an error of law or total lack of supporting evidence, the Court will not substitute its judgment for that of the Commission. *West Penn Power Co. v. Pennsylvania Public Utility Commission,* 147 Pa.Cmwlth. 6, 607 A.2d 1132 (1992). I also recognize that, despite lengthy arguments to the contrary, nothing in the "plain language" of the GAE provision supports the interpretation advanced by the Commission. For example, the GAE provision contains no clause stating that Duquesne (now Reliant) may, in its sole discretion and for economic or any other reason at all, refuse to sell any electricity to U.S. Steel at the GAE rate.[3] In view of the deference that this Court must afford the Commission's tariff interpretations, I would defer to its interpretation of the GAE provision but for the rate-cap protections in Section 2804 of the Competition Act. However, in view of the Commission's clear error of law in interpreting the GAE provision its order should be reversed.

In conclusion, I briefly respond to additional arguments raised by the Commission and noted by the majority. First, I do not find particularly persuasive the textual argument that, because the GAE provision refers to GAE as an "option" and because the provision requires the customer to inquire as to the availability of GAE and to consent to a "mutually agreeable demand threshold," that the availability of GAE was meant to be solely within the supplier's discretion. The "option" refers to the customer's choice in purchasing GAE or in engaging in self-generation, not to the supplier's choice of whether to sell GAE at all. Nor do the facts that GAE may not always be available or that the

---

**2.** Contrary to the arguments raised by the Commission and by Reliant, the plain language of Section 2804 of the Competition Act demonstrates its applicability here. The introductory clause to Section 2804 provides: "The following interdependent standards shall govern the commission's assessment and approval of each public utility's restructuring plan, oversight of the transition process and regulation of the restructured electric utility industry...."

**3.** The Commission and Reliant cannot support the assertion that the Commission was *compelled* to issue its decision in order to correct what was a clear violation of Duquesne's lawfully approved tariff. For example, the Commission did not find that the tariff set a specific per-unit-price for the sale of GAE and that Duquesne and U.S. Steel had later agreed upon a lower per-unit-price, in direct contravention of the tariff provision. Instead, the Commission's reliance on changed or hypothetical economic conditions in order to support its decision, evident in portions of its decision quoted by the majority, suggests that what the Commission has done is not merely to "interpret" a longstanding tariff provision but substantively to change that tariff in order to accommodate present economic and industry conditions. The Commission may have that authority, but it may not issue a decision which results in a violation of the Competition Act's rate-cap protections or change tariff rates without following proper procedure.

parties must agree on a demand threshold support the notion that the supplier has sole and unfettered discretion in deciding whether to provide GAE; those facts are more consistent with the long-standing interpretation by Duquesne and U.S. Steel that some level of GAE must be provided when supply is available on the energy market. Moreover, the fact that litigation might ensue over a supplier's repeated and unreasonable refusal to agree to a monthly demand threshold does not support a conclusion that the supplier may in its sole discretion refuse to supply any GAE.

Second, it is misleading to characterize the manner in which Duquesne and U.S. Steel have implemented the GAE provision as being a somewhat surreptitious "private deal" between two parties that wished to evade the plain meaning of a tariff provision. I agree, as the majority notes, that a tariff must be applied consistent with its language and not according to any private understanding. Section 1303 of the Public Utility Code, 66 Pa.C.S. § 1303; *see Byer v. Peoples Natural Gas Co.*, 251 Pa.Super. 75, 380 A.2d 383 (1977). As already observed, however, the understanding by Duquesne and U.S. Steel *is* consistent with language of the GAE provision. Additionally, the HVPS rate class and the GAE provision were *intended* to be of special benefit to U.S. Steel; the 1987 tariff amendment was approved by the Commission; and Duquesne and U.S. Steel have followed the same interpretation of the provision for some fifteen years. The matter of GAE was again brought to the Commission's attention during Duquesne's restructuring proceedings, and neither Duquesne, U.S. Steel nor any other source complained about the arrangement. During negotiations leading to the POLR I Agreement, Orion apparently did not question the manner in which GAE was to be supplied. Any suggestion or inference that Duquesne and U.S. Steel attempted to evade the correct interpretation of the tariff is contradicted by the record.

The Commission's interpretation undisputedly eliminates the GAE rate heretofore available to U.S. Steel, and it impermissibly increases the charges that U.S. Steel must pay for generation supply during Duquesne's restructuring transition period in direct contravention of the plain meaning of Section 2804(4)(ii) of the Competition Act. The Commission committed a reversible error of law in adopting Reliant's interpretation of the GAE provision and in holding that Reliant, as the generation supplier, has the sole discretion to determine whether it will provide GAE to U.S. Steel in accordance with the obligations under Duquesne's existing tariff and the POLR I Agreement.[4] Accordingly, I dissent.

Judge COHN and Judge SIMPSON join in this dissenting opinion.

---

4. I agree fully with the conclusions reached by Commissioner Wilson, Jr., in his February 2003 dissent, *i.e.*, that the central issue here concerns the obligations of energy suppliers to comply with an HVPS tariff that existed before and after enactment of the Competition Act and that the effect of the Commission's decision is to rewrite a valid tariff and to reverse its prior approval of a tariff in its restructuring order by imposing new conditions.