**PPL ELECTRIC UTILITIES
CORPORATION,
Petitioner**

v.

**PENNSYLVANIA PUBLIC UTILITY
COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Sept. 11, 2006.

Decided Dec. 6, 2006.

---

388

David B. MacGregor, Philadelphia, for petitioner.

Kimberly A. Joyce, Asst. Counsel and Robert F. Young, Deputy Chief Counsel, Harrisburg, for respondent.

Timothy J. Nieman, Harrisburg, for intervenor, Commercial Utility Consultants and Public Utility Service Corporation.

BEFORE: McGINLEY, Judge, PELLEGRINI, Judge, and KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

PPL Electric Utilities Corporation (PPL) appeals from the order of the Pennsylvania Public Utility Commission (Commission) entered on January 17, 2006, which ordered PPL to cease and desist from violating its tariff and Section 1303 of the Public Utilities Code (Code), 66 Pa. C.S. § 1303.[1]

### Complaint Against PPL

Commercial Utility Consultants (CUC) and Pennsylvania Utility Service Corporation (PUSC) (collectively "Complainants") are private utility consulting companies which provide consulting and sales tax audit services to, among others, PPL customers. CUC and PUSC contract with commercial utility customers to analyze the rates, tariffs, discounts, and riders that apply to utility billings and submit recommendations for possible savings, credits or refunds.[2] In exchange for these services, CUC and PUSC receive from the customer up to 50% of the customers' savings that result from their recommendations.

On November 23, 1999, CUC filed a Complaint against PPL in the Court of Common Pleas of Chester County (common pleas court). That Complaint was consolidated with a separate action filed by PUSC. *Commercial Utility Consultants and Public Utility Service Corp. v. Pennsylvania Power & Light Co.*, Civ. Action

No. 99-09799. In that consolidated action, Complainants alleged that PPL tortuously interfered with their contractual relationships with certain customers of PPL. Those claims were based upon certain actions by PPL including: (1) its calculation of the maximum "interruptible load" on its system; (2) PPL's agreement to prematurely terminate a one-year contract for "interruptible service" at the request of a customer whose industrial operations turned out to be inconsistent with "interruptible service"; (3) PPL's adjustment of "base periods" to reflect current normal operations where the base period is used to determine the amount of incremental load eligible for discounted rates; and (4) PPL's disclosure of confidential customer information to ("Spectrum") the joint venture of PPL, Spectrum, Inc. and Utilities Management Consultants, Inc. (UMC).

Complainants alleged that these actions by PPL constituted violations of its tariff filed with the Commission and/or violations of the Code.

### Issues Referred to Commission pursuant to Primary Jurisdiction

■ On January 23, 2001, the parties entered into a stipulation whereby the parties agreed to refer certain issues to the Commission for determination under the doctrine of primary jurisdiction.[3] On Jan-

---

1. Section 1303 of the Code provides, in part, as follows:
   No public utility shall, directly or indirectly, by any device whatsoever, or in anyway, demand or receive from any person, corporation, or municipal corporation a greater or less rate for any service rendered or to be rendered by such public utility than that specified in the tariffs of such public utility applicable thereto. The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part....
   66 Pa.C.S. § 1303.

2. For example, CUC made a recommendation to one of PPL's customers, Quaker Oats, to subscribe to an interruptible rate of service (discussed *infra*) under PPL's tariffs as a cost savings measure.

3. Essentially, the doctrine creates a workable relationship between the courts and administrative agencies wherein, in appropriate circumstances, the courts receive the benefit of the agency's views on issues within the agency's competence. *Elkin v. Bell Tel. Co.*, 491 Pa. 123, 420 A.2d 371 (1980). The purpose of the doctrine, among other things, is to make

uary 24, 2001, the common pleas court stayed all proceedings in the Chester County Action and referred the following issues to the Commission:

1. Under PPL's interruptible rates, was PPL required to calculate the 500 MW [megawatt] cap as (1) the twelve month average of each customer's monthly Maximum On-peak Demand less the customer's contract Firm Power, or (b) as the total of each customer's maximum monthly demand during the previous 12 month period less the customer's contract Firm Power?

2. Under PPL's Industrial Development Initiatives Rider [IDI], if the customer's usage during the twelve months ending December 31, 1991, was representative of the customer's expected normal usage pattern during that time, was PPL authorized to use another base period in applying the Rider?

3. Whether PPL was permitted to provide marketing support and customer account information to the joint venture of PPL and Spectrum, Inc. and Utilities Management Consultants, Inc., which marketing support and information was not made available to other utility consulting companies and businesses?

4. Where the language of PPL's LP–5 tariff states that interruptible service contracts are to be for a period of one year, may PPL and a customer privately agree to limit the term of the interruptible service contract to 6 months?

On March 19, 2002, Complainants filed a Complaint with the Commission which formulated the issues referred by the common pleas court to the Commission. PPL

filed an answer on April 10, 2002. Following exchanges of written testimony and exhibits, the parties participated in evidentiary hearings before the ALJ on December 17–18, 2002.[4]

### Interruptible Service and the 500 MW Cap

The first issue presented to the ALJ involved the formula used by PPL to calculate the 500 MW cap for the amount of interruptible power that PPL would accept on its system.

Interruptible service authorizes PPL to require a customer to stop using electricity or reduce consumption of electricity for periods in the rate schedule. Generally, PPL interrupted service to a customer during periods of peak load, emergencies, testing periods, or when the requirements of all customers approached the maximum level of electricity that PPL was able to generate. Interruptible service was provided at a significantly reduced rate to reflect the lower quality, i.e., the interruptible nature, of the service.

This first issue deals with how PPL determined whether the amount of interruptible power from interruptible customers exceeded a total of 500 MW. When the requirements of interruptible customers approached the 500 MW, PPL stopped entering into new interruptible service contracts with other customers. In other words, there was a limit on the number of customers which could subscribe to interruptible service. That number depended upon how PPL calculated the 500 MW cap.

Oliver Kasper (Kasper), PPL's manager of pricing and contract administration, tes-

---

use of the agency's special experience and expertise in complex areas and promote consistent and uniform administrative policy. *Id.*

4. The testimony submitted to the ALJ included certain excerpts from the pre-filed testimo-

ny PPL previously presented to the Commission in connection with its proposed changes to its optional interruptible rate provisions in 1995. The parties refer to these proceedings as the "1995 base rate case."

tified that PPL first began to allow greenhouse customers to subscribe to interruptible power in 1983. PPL made several interruptible service options available to its customers. Those appeared in its tariff as Rate Schedules IS–1, LP–4 and LP–5, and Interruptible Service by Agreement. Notes of Testimony, December 17, 2002, (N.T. 12/17/02) at 59; Direct Testimony of Oliver G. Kasper in 1995 Base Rate Case Before Commission at 10–11, Reproduced Record (R.R.) at 17a, 443a. When originally proposed, these optional interruptible rate provisions were intended in part to address economic and competitive concerns of PPL's customers.

Kasper testified that on May 13, 1993, PPL filed a supplement to its tariff and proposed to modify certain aspects of its interruptible power provision which included putting a cap on the amount of interruptible power that PPL would generate. N.T. 12/17/02 at 61; R.R. at 19a. PPL filed with the Commission "Proposed Tariff No. 200, Supplement 50" which contained this proposal as follows:

> Optional Interruptible Power is available to customers under this rate schedule with at least 1000 KW of year-round interruptible power who contract to accept interruptible service for at least one year, as detailed in this provision.
>
> *The Company [PPL] will limit the amount of interruptible power to a total of 500 MW from all customers* served under Rate Schedule LP–4, LP–5, LP–6, IS–1, and Interruptible Service by Agreement. *For the purposes of determining this amount, interruptible power is* **the twelve month average of each customer's monthly Maximum On-peak Demand** *less the customer's contract Firm Power level.* (emphasis added)

Hearing Exhibit C–2 "Rate Schedules LP–4, LP–5 and LP–6"; R.R. at 459a.

PPL submitted to the Commission Kasper's pre-filed direct testimony in the 1995 base rate case. In that prior proceeding Kasper explained the reasons why PPL sought to put a cap on the amount of interruptible power PPL would generate:

> Since the LP–4 and LP–5 interruptible service options were introduced, several factors have changed. First … the value of interruptible load has declined materially. This effect has greatly magnified the difference between the discounts for interruptible service offered by the Company [PPL] and the discounts from firm service rates that would be justified by current cost levels. Second, because of the discounts available for electing interruptible service, otherwise non qualifying customers have been encouraged to use on-site generation as a means of capturing marginal net benefits from lower electric rates. This trend has had the effect of materially increasing the pool of customers that could elect the interruptible service options. The revenue erosion that would result for the Company [PPL] from this increased number of interruptible customers would reduce the industrial class contribution to fixed costs and thereby, shift revenue responsibility to firm service industrial and non-industrial core customers with no corresponding benefit to the regional economy by way of business expansion or job growth. Moreover, because of the uneconomic cost-shifting that on site-generation makes possible, core customers who face a variety of competitive pressures but cannot use on-site generation to qualify for interruptible discounts would eventually see higher rates and resulting erosion in their competing positions.

Direct Testimony of Oliver G. Kasper in 1995 Base Rate Case Before Commission at 10–11, R.R. at 444a–445a.

Kasper went on to explain in the 1995 base rate case how PPL proposed to calculate the cap of 500 MW of non-coincident interruptible load using a "rolling average method":

> This is a monthly rolling average of the sum of the individual customer's average monthly maximum demands minus the sum of the individual contracted firm demands. On a diversified basis, this should result in a monthly peak demand reduction capability of about 300 to 350 MW.

N.T. 12/17/02 at 72, 76, Hearing Exhibit C–4; Direct Testimony of Oliver G. Kasper in 1995 Base Rate Case Before Commission at 15, R.R. at 30a, 34a, 434a, 449a.

On October 5, 1995, the Commission approved PPL's tariff supplement which implemented the 500 MW cap and created new rate schedules for interruptible power.

### Definition of Interruptible Power in the Approved Tariff

For purposes of determining the 500 MW cap, PPL's approved tariff provided:

> *The Company [PPL] will not enter into new contracts for interruptible power if the amount of interruptible power from all customers served under Rate Schedules IS–1, IS–P, IS–T, PR–2, the Competitive Rate Rider, and Interruptible Service by Agreement exceeds a total of 500 MW. For the purpose of determining this amount [500 MW] interruptible power is the twelve month average of each customer's monthly Maximum On-peak Demand less the customer's contract Firm Power level.*

General Tariff, Supplement 56, October 5, 1995 at original page 30A; R.R. at 466a (emphasis added).

Thus, the objective of the change was to allow PPL to stop entering into new contracts for interruptible service once the amount of PPL's interruptible load exceeded a total of 500 MW. When PPL's interruptible power load exceeded 500 MW, customers who wished to contract for interruptible service were placed on a waiting list. When PPL's interruptible load went below 500 MW, PPL permitted the wait list customers to obtain interruptible service.

Complainants assert that PPL calculated the 500 MW cap in a manner which overstated the amount of its interruptible load. In other words, they contend that PPL made it appear as though the 500 MW cap was reached before it actually was. As a result, several customers felt that they were denied the opportunity to contract for the less expensive interruptible service.[5]

### "Twelve Month Average of Each Customer's Monthly Maximum On-peak Demand"

Complainants assert that PPL misinterpreted and misapplied the term "twelve month average of each customer's monthly Maximum On-peak Demand" when calculating whether it reached the 500 MW cap. Maximum On-peak Demand is defined in PPL's tariff as "the average number of kilowatts supplied during the 15 minute period of the maximum use during the on-peak hours of the current billing period." General Tariff, Supplement 56, October 5, 1995 at original page 30A; R.R. at 466a.

According to Kasper, PPL defined twelve month average of each customer's monthly Maximum On-peak Demand, as

---

5. For example, Caradon Metal Industries, one of PPL's customers, filed a lawsuit against PPL Electric and disputed PPL Electric's calculation of the 500 MW cap, and maintained that it should have been permitted to contract for interruptible service at an earlier time. That suit was settled by agreement.

used in the calculation of the 500 MW cap, to be the "demand placed on the system over a one year period at the maximum point of a customer's load." N.T. 12/17/02 at 63; R.R. at 21a. Kasper explained that the "rolling average method" which PPL initially intended to utilize, was eventually abandoned by PPL because it was not practical and was too difficult to administer month to month. N.T. 12/17/02 at 78; R.R. at 36a. He testified that for purposes of making interruptible power calculations, PPL selected the *highest* On-peak Demand for the whole twelve-month period. N.T. 12/17/02 at 65; R.R. at 23a. PPL referred to this as the "annual peak demand method."

Kasper further testified that the definition of "twelve month average for each customer's monthly Maximum On-peak Demand" in the tariff was for "billing purposes" only; not for determining the cap: "In determination of the cap, we use the maximum of those 12 [highest 15 minute periods of maximum use] in a current year." N.T. 12/17/02 at 64; R.R. at 22a. Kasper had difficulty explaining how the "twelve month average of each customer's monthly On-peak Demand" was measured in compliance with the provision in the tariff when PPL just chose the one highest 15 minute period of maximum use over the whole twelve-month period for purposes of calculating the cap. N.T. 12/17/02 at 66–67; R.R. at 24a–25a.

PPL also presented the pre-filed written testimony of Douglas A. Krall (Krall), PPL's Manager of Regulatory Strategy. Krall corroborated that the calculation required finding each customer's maximum monthly demand during the previous twelve month period less the customer's contract Firm Power. In other words, PPL used the customer's single highest Maximum On-peak value over a twelve-month period instead of *averaging* the monthly Maximum On-peak values. Pre-filed Testimony of Douglas A. Krall at 10–11; R.R. at 316a–317a.

Krall explained that this method was consistent with the policy and nature of interruptible service and the purpose of the 500 MW tariff, which was to obtain 300 to 350 MW of coincident interruptible load during system peak periods. He believed that using Complainant's formula, using the twelve month average, would mask the system's actual maximum peak demand:

*Complainants' interpretation is inconsistent with how PPL Electric has calculated interruptible load.* PPL Electric's calculation reflected the fact that interruptible load is analogous to peaking generation because it was based on a customer's highest monthly demand over the course of a twelve month period. In contrast, Complainants' method *averages monthly peak* demands over an entire year. This approach would result in customer interruptions much closer to 500 MW of coincident load than the intended 300 to 350 MW of coincident load because it is far more likely that a customer will interrupt at a level equal to its monthly average peak demand than its annual maximum peak demand. As a result, if Complainants' approach had been intended, PPL Electric would have proposed that the Commission establish a cap much lower than 500 MW in order to obtain the intended 300 to 350 MW of coincident interruptible load.

Therefore, *Complainants' calculation would have resulted in PPL Electric contracting for substantially more interruptible load than necessary for its local management.*

Pre-filed Testimony of Douglas A. Krall at 11–12; R.R. at 317a–318a (Emphasis in original).

Before the ALJ, Complainants argued that the tariff should be interpreted in

accordance with its plain and unambiguous meaning. It asserted that the tariff was sufficiently clear so that the Commission was not required to consider the policy reasons described by Krall. Complainants asserted that the tariff required PPL to calculate the twelve-month *average* of each customer's monthly Maximum On–Peak Demand values less the customer's contract Firm Power (the twelve month *average* methodology). Complainants asserted that the formula in the tariff, a 12 month average, was ignored by PPL.

The ALJ agreed with the Complainants that the tariff language was sufficiently clear and he was not required to consider any policy reasons. The ALJ concluded that the tariff required PPL to use a twelve month average of each customer's Maximum On-peak Demand. In other words, PPL should have (1) identified the highest 15 minute period of peak usage on a monthly basis for each customer for a twelve-month period and added those 12 values; (2) divided that number by 12; (3) subtracted the customer's firm power commitment to arrive at the average interruptible power peak for each customer. Then, having identified the average interruptible power peak for each customer, PPL should have added the average peaks together and compared them to the 500 MW threshold.

The ALJ concluded that PPL's failure to adhere to its tariff was a violation of Section 1303 of the Code, 66 Pa.C.S. § 1303.

### The IDI Rider

The next issue before the ALJ involved Industrial Development Initiatives Rider (IDI Rider) which was implemented in 1992. PPL offered its industrial customers a credit in the amount of 1 cent per kilowatt hour and $2 per kilowatt billed in excess of the load purchased by the customer during its "base period." The issue

was whether PPL violated its tariff by applying the wrong "base period" to particular customers for purposes of calculating the credit. The disputed language in the tariff provided:

1. Base Period—For customers entering the program on or after the effective date of this rider, the base period is the twelve months ended December 31, 1991. If billing history is unavailable for the twelve months ended December 31, 1991, the base period will be the first full twelve months of billing. If less than twelve months billing history is available, the Company will determine a base period prior to application of the rider. *If, in the opinion of the Company [PPL], usage during any billing month(s) of the base period is not representative of the customer's expected normal usage pattern, the Company [PPL] may change the base period Billing KW and kilowatt-hours to reflect normal usage.*

Pa. P.U.C. No. 200, Original Page No. 19D (emphasis added).

The parties generally agreed that the tariff established the default base period for 1991, and that there were three exceptions to using 1991 as the default base year. First, in those instances where the 12 months of billing history prior to December 31, 1991, was not available, the language required using the first full 12 months of billing. Second, if 12 months of billing was not available, PPL had the discretion to determine the base period. *Third, if usage in any billing month in the base period was not representative of the customer's normal usage pattern, then PPL had the discretion to change the data for the base period.* The third scenario was the subject of the parties' dispute.

Krall explained that the IDI Rider was an incentive rate billing option for existing and new industrial customers which was

designed to encourage economic development in PPL's service area. Pre-filed Testimony of Douglas A. Krall at 19; R.R. at 325a. In order to qualify, the customer had to agree to increase production or physically expand the plant. He explained that if a customer requested to be billed under the IDI Rider, PPL would look at the customer's most recent annual use and compare it to the 1991 billing period to see if it was materially different. Pre-filed Testimony of Douglas A. Krall at 20; R.R. at 326a. If a change was noted, then the base period would be chosen to reflect current conditions. This was done because the IDI Rider was intended as an incentive to encourage future development. Krall testified that the tariff placed the determination of the proper base year within PPL's discretion by leaving the analysis of whether a customer's usage was representative of the customer's normal usage pattern "in the Opinion of the Company [PPL]." *Id.* at 326a.

Complainants asserted, on the other hand, that the tariff failed to define what kind of abnormal usage pattern during which 12–month time period was sufficient to trigger the exercise of PPL's discretion. Complainants asserted the tariff was ambiguous and any lack of clarity should be construed against PPL as the drafter.

The ALJ found in favor of the Complainants, although he did not agree that the tariff language was ambiguous. The ALJ analyzed the tariff in steps. He initially looked to the first sentence of the tariff:

> For customers entering the program on or after the effective date of this rider, the base period is the twelve months ended December 31, 1991.

The ALJ interpreted this sentence as creating a "base period" for each industrial customer in business (and using service from PPL) starting on or before January 1, 1991, and remained in business on or after the effective date of the rider.

The second step related to the exceptions to this rule for general "base period" designation. The first exception (and second step) is found in the second sentence of the tariff:

> If billing history is unavailable for the twelve months ended December 31, 1991, the base period will be the first full twelve months of billing.

The ALJ read this to apply to customers that did not start operations until after January 1, 1991, *and* had twelve months of billing history. For these customers, the "base period" was their first full twelve months of billing (e.g., June 1, 1991—May 31, 1992).

The second exception (and third step) is found in the third sentence of the tariff:

> If less than twelve months of billing history is available, the Company [PPL] will determine a base period prior to application of the rider.

The ALJ read the second exception as being designed to include those industrial customers which did not yet have twelve months of service from PPL at the time service was requested under the IDI Rider. In that situation, PPL had the discretion to determine a "base period" for the customer.

The fourth (last) sentence of the tariff is the one in dispute. It reads, as follows:

> If, in the opinion of the Company [PPL] usage during any billing month(s) of the base period is not representative of the customer's expected normal usage pattern, the Company [PPL] *may change the base period Billing KW and kilowatt-hours* to reflect normal usage.

The ALJ determined that this last sentence, unlike the prior three sentences, did not deal with the subject of creating a new

"base period" and consequently it did not authorize PPL to create a new "base period" for the customer. It only gave PPL the opportunity to decide if each month of the base period met its expectations of the customer's normal usage pattern, and if it did not, PPL could make some monthly changes to the "Billing KW and kilowatt-hours" to reflect what PPL believed was the customer's normal usage in the base period.[6]

After conducting a review of the manner in which PPL administered the tariff and substituted "new base periods" for the customers who applied for the IDI Rider service, the ALJ concluded that PPL failed to adhere to its tariff in violation of Section 1303 of the Code, 66 Pa.C.S. § 1303.

### PPL's Market Support to its Unregulated Affiliates

The next issue before the ALJ concerned whether PPL was permitted to provide marketing support and customer account information to Spectrum and UMC, its unregulated affiliates.

Before the ALJ, Complainants asserted that PPL analyzed data from its industrial customers on the regulated side to determine whether the customer had a good potential for services marketed by Spectrum. Complainants argued that these activities constituted "market support" and violated Sections 1304 and 1502 of the Code[7] and discriminated against them and their clients.

John K. Steckel, Jr. (Steckel), a principal of Spectrum, testified that Spectrum was an unregulated affiliate of PPL which provided energy-related project development and consulting services focused on large industrial and commercial customers. Pre-filed Direct Testimony of John K. Steckel, Jr. at 3; R.R. at 426a. Spectrum, which is no longer in existence, assisted companies in obtaining energy tax exemptions and tax credits. Those tax exemptions and credits related to Pennsylvania sales and use tax paid by certain companies on their consumption of electric service. Spectrum provided advice to industrial customers concerning their entitlement to a proportional exemption from those taxes based on the consumption of electric energy used in their manufacturing processes versus their total electrical consumption. Pre-filed Direct Testimony of John K. Steckel, Jr. at 4; R.R. at 427a.

Steckel testified that PPL did not provide customer account information to Spectrum or UMC without a customer release form. Some PPL account managers did provide assistance to the joint venture by recommending the services of UMC to customers who expressed an interest in receiving tax exemption audit advice. Pre-filed Direct Testimony of John K. Steckel, Jr. at 5; R.R. at 428a. Steckel explained that the time PPL account managers spent on non-PPL activities was charged to the affiliate pursuant to a Services Agreement between PPL and its unregulated affiliates.[8]

PPL's former key account manager, Charles Vincent Anthony (Anthony) also testified on the subject. His primary role was to insure that his industrial customers

---

6. An example where the base period data may be distorted and this sentence resorted to is when there was a power outage, and the customer was out of business during its base period. In that situation, PPL had the opportunity to adjust the usage data to reflect the customer's "expected normal usage pattern" for that period.

7. 66 Pa.C.S. §§ 1304, 1502.

8. The joint venture agreement was eventually terminated in 1999 and ended in a lawsuit and allegations that PPL failed to provide enough marketing support to UMC.

were assigned to the correct rate base on usage patterns. N.T., December 18, 2002, (N.T. 12/18/02), at 166–167, R.R. at 124a–125a. He testified that he and other PPL account managers would provide referrals to UMC or Spectrum for potential sales tax audits. N.T., 12/18/02 at 185; R.R. at 143a. He identified, through his job capacity on the regulated side, whether the potential sales tax audit would be helpful to a customer. He would then refer the customer to Spectrum or UMC. N.T., 12/18/02 at 189; R.R. at 147a. Anthony admitted that one of the purposes of creating the joint venture was to "displace other utility consultants." N.T., 12/18/01 at 199–200; R.R. at 157a–158a.

Anthony further admitted on cross-examination that he wrote a letter to Quaker Oats, one of PPL's customers (also a customer of CUC, one of the Complainants) and offered Quaker Oats interruptible service even though he knew CUC was under contract to provide Quaker Oats with consulting services and had already recommended interruptible service to Quaker Oats. One condition was that Quaker Oats sign a confidentiality agreement not to tell anyone, including CUC, that PPL was below the 500 MW limit for interruptible service as of May 20, 1996. N.T., 12/18/02 at 170–183; R.R. at 128a–141a. Anthony explained that the purpose of the confidentiality agreement was to make sure that this information (where PPL stood with respect to the 500 MW cap) was "only" shared with Quaker Oats at that time. N.T., 12/18/02 at 177–178; R.R. at 135a–136a.

Ronald William Pezon (Pezon), a former PPL account manager, was also called as a witness. Pezon attended a meeting on September 15, 1995, with PPL's interruptible customers. The purpose of the meeting was to further explain the interruptible rate to industrial customers. Apparently, representatives from CUC came to the meeting. Pezon objected to the presence of CUC at the meeting where information was being provided about one of PPL's rates, stating that CUC was a "competitor" and that he "cringed" at the thought of CUC expanding their business at PPL's expense. N.T. 12/18/02 at 216–221; R.R. at 174a–179a.

The ALJ agreed with Complainants and concluded that PPL violated Section 1502 of the Code, 66 Pa.C.S. § 1502, by using its account managers and executives to identify potential business opportunities for services from its non-regulated affiliates.[9]

Section 1502 of the Code entitled "Discrimination in service" states:

> No public utility shall, **as to service,** make or grant any unreasonable preference or advantage to any person, corporation or municipal corporation, or subject any person, corporation or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to service, either as between localities or as between classes of service, but this section does not prohibit the establishment of reasonable classifications of service. (Emphasis added).

66 Pa.C.S. § 1502.

The word "service" is defined in the Code as follows:

> "Service". Used in its broadest and most inclusive sense, includes any and all acts

---

**9.** The ALJ rejected Complainants' argument that PPL's conduct violated Section 1304 of the Code, 66 Pa.C.S. § 1304, because that section concerned *"rates."* According to the ALJ, the issue concerned "services" which is within the purview of Section 1502, 66 Pa. C.S. § 1502.

done, rendered, or performed, and any and all things furnished or supplied, and any and all facilities used, furnished, or supplied by public utilities, ... in the performance of their duties under this part to their patrons, employees, or other public utilities, and the public,....

66 Pa.C.S. § 102.

The ALJ looked to the duties of "account managers." According to PPL's former account manager his duties included "offering energy services, other technical services and information pertaining to electric rates to industrial customers." The ALJ interpreted this to mean that account managers knew all of their customers' electric usage and costs for business purposes. He concluded that this information was confidential to the customer and extremely valuable to energy consultants like Complainants. He determined that this permitted PPL to gain an unfair advantage over other energy consultants like CUC and PUSC. He found it no defense that account managers charged their time to Spectrum because they relied upon the goodwill they acquired as part of their regulated duties.

The ALJ concluded that if knowledge and, or, goodwill gained at the ratepayer's expense was used to generate profit for a non-regulated affiliate it amounted to "cross-subsidization" which is unlawful under Section 1502 of the Code, 66 Pa.C.S. § 1502.

Finally, the ALJ concluded that PPL discriminated against the Complainants under Section 1502 of the Code, 66 Pa.C.S. § 1502, because the joint venture planned to "displace" other utility consultants.

### Twelve–Month Contract

PPL's tariff states that interruptible service contracts are to be for a period of one year. The last question before the ALJ was whether PPL and a private customer could limit the term of the interruptible service contract to six months.

PPL argued that the purpose of the tariff section requiring the minimum one-year contract was to prevent customers from price shopping and switching carriers during times when interruptions were unlikely. In other words, the purpose of the tariff was to prevent a customer from switching back and forth between interruptible and firm service in order to receive a reduced rate for interruptible service without incurring the risk of interruption. PPL indicated that in one instance, A & E Products, one of PPL's customers, requested a change because it turned out that interruptible service was not compatible with its operations. The parties mutually agreed to terminate the service. PPL knew the customer was not trying to "game" the system and agreed because the change benefited both PPL and the customer. Pre-filed Testimony of Douglas A. Krall at 22; R.R. at 328a.

The ALJ concluded that Section 1303 of the Code, 66 Pa.C.S. § 1303, "simply does not permit PPL to deviate from its approved tariff language." The parties agree that the tariff required the contract period to be "Not less than one year." The ALJ relied on case law that held a utility may not enter into a contract which varied its tariff rate. The ALJ concluded that this was exactly what the parties did here; they "mutually agreed" to terminate the one-year contract and entered into a new one, for six months. Plainly, the customer had received the benefit of one of PPL's two peak seasons, and avoided the risk of interruption during the other. This was the precise conduct the tariff sought to avoid to ensure that all interruptible service customers equally shared in the risks and benefits of interruptible service throughout the year.

I interpret this Section [1303] of the Code to mean that, without regard to what the utility may have intended, the utility is required to apply the language in the existing tariff as approved by the Commission. In other words, if the language in the tariff is clear, then the utility must apply it uniformly to customers.

ALJ Decision, at 8–9.

The ALJ concluded that PPL violated its tariff by mutually agreeing with its customer to move the customer to firm service from interruptible service before the expiration of the one-year minimum term.

The ALJ issued a recommended decision and order that PPL (1) cease and desist from further violations of section 1303 of the Code, 66 Pa.C.S. § 1303, with respect to its calculation of the 500 MW cap for interruptible customers, (2) cease and desist from further violations of section 1303 of the Code, 66 Pa.C.S. § 1303, with respect to its attempts to select a new base period for any IDI Rider customer, (3) cease and desist from further violations of section 1502 of the Code, 66 Pa.C.S. § 1502, by using and continuing to use the knowledge and goodwill gained in the regulated duties of its key account managers to cross-subsidize and benefit its non-regulated affiliates; and (4) cease and desist from further violations of Section 1303 of the Code, 66 Pa.C.S. § 1303, by refusing to enter into any agreement which has the effect of reducing the one-year period required for interruptible service contracts.

PPL filed exceptions to the ALJ's Initial Decision. The Commission entered an order and opinion which essentially adopted the ALJ's findings in their entirety and affirmed the ALJ's recommended decision with one minor exception. The ALJ found that PPL violated Section 1303 of the Code with regard to its application of the IDI Rider. However, because Complainants did not identify any customer for which PPL used the wrong base period, the Commission did not conclude that PPL violated 66 Pa.C.S. § 1303 with regard to its application of the IDI Rider.[10] The Commission granted PPL's exception on that one issue. The Commission adopted the ALJ's recommended decision in all other respects.

■■■■ On appeal[11], PPL raises six issues:

1. Whether the ALJ and Commission misapplied the proper principles of tariff interpretation?

2. Whether PPL may, with the agreement of the affected customer, apply general provisions of contract law and waive a portion of the minimum term provision of a rate schedule, where such waiver was consistent with the plain language of the tariff and where the continued application of the rate schedule would have been detrimental to the affected customer, PPL, and its customers in general?

3. Whether PPL correctly applied its IDI Rider so that the discounts available under it were applied only to prospective

**10.** The Commission, however, did adopt the ALJ's conclusion that PPL's position with regard to the IDI Rider was contrary to the plain language of the tariff.

**11.** The Commission, not the ALJ, is the ultimate factfinder in proceedings before it and must resolve conflicts in testimony as well as weigh the evidence presented. *Pennsylvania*

*Electric v. Pennsylvania Public Utility Commission*, 81 Pa.Cmwlth. 285, 473 A.2d 704 (1984). This Court is required to affirm the order of the Commission if it is based upon substantial evidence and does not contain an error of law or offend a constitutional requirement. *UGI Utilities v. Public Utility Commission*, 878 A.2d 186 (Pa.Cmwlth.2005).

increases in usages where such interpretation is consistent with the plain language of the tariff and the underlying purpose for which the Commission approved the IDI Rider?

4. Whether PPL correctly interpreted and applied the provisions of its tariff that placed a 500 MW cap on load eligible for interruptible services where PPL's interpretation was fully consistent with the applicable tariff language and its underlying intent and purpose?

5. Whether Section 1502 of the Public Utility Code, 66 Pa.C.S. § 1502, applies to tax auditing services that were unrelated to public utility service?

6. Whether PPL's provision of certain customer information, with customers' consent, to an unregulated affiliate to facilitate sales tax audits unreasonably discriminated against Complainants?

■ Initially, this Court notes that as the administrative agency charged with regulating utilities under the Code, the Commission is responsible for regulating utility rates and evaluating tariffs, and as such, it has the particular expertise over such matters. *PP & L Industrial Customer Alliance v. Pennsylvania Public Utility Commission*, 780 A.2d 773 (Pa. Cmwlth.2001); *Optimum Image, Inc. v. Philadelphia Electric Co.*, 410 Pa.Super. 475, 600 A.2d 553 (1991). Therefore, this Court must defer to the Commission's interpretation of the governing statute, regulatory pronouncements and the terms of the tariff in reviewing a PUC decision. *W.C. McQuaide, Inc. v. Pennsylvania Public Utility Commission*, 137 Pa. Cmwlth. 282, 585 A.2d 1151 (1991); *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 106 Pa.Cmwlth. 240, 526 A.2d 823, *appeal denied*, 516 Pa. 644, 533 A.2d 714 (1987). The Commission's expert interpretation of those issues is entitled to great deference and should only be re-

versed if *clearly* erroneous. *United States Steel Corp. v. Pennsylvania Public Utility Commission*, 850 A.2d 783, 789 (Pa. Cmwlth.), *petition for allowance of appeal denied*, 581 Pa. 687, 863 A.2d 1151 (2004); *Aronson v. Pennsylvania Public Utility Commission*, 740 A.2d 1208 (Pa.Cmwlth. 1999), *petition for allowance of appeal denied*, 561 Pa. 700, 751 A.2d 193 (2000).

## I.

### *Whether the Commission Failed to Apply Proper Principles of Tariff Interpretation?*

PPL first contends that the Commission applied an incorrect standard of tariff interpretation because it, like the ALJ, failed to look *beyond* the "four corners" of the tariff to ascertain its meaning. PPL maintains that the Commission was required to consider the policy reasons behind a tariff to interpret it. PPL claims that the Commission either improperly applied the principles of statutory interpretation or it mistakenly attempted to apply the parole evidence rule of Pennsylvania contract law. PPL further contends that the Commission's "four corners approach" to tariff interpretation was fundamentally inconsistent with the doctrine of primary jurisdiction, the purpose of which is to obtain the benefit of the Commission's expertise and experience in public utility regulation.

First, this Court agrees with Complainants that the Commission neither misapplied the rules of statutory construction nor the parole evidence rule when it interpreted PPL's tariff. The Commission, as it was required to do, looked first to the four corners of the tariff and considered the entire instrument as a whole. After giving effect, as far as possible, to every word, clause and sentence, the Commission attributed to the words the meanings

which are generally used, understood, and accepted. Because the Commission found no ambiguity, it did not consider PPL's proffered extrinsic evidence to determine the meaning of the tariff. The Commission's analysis of the tariff language was entirely consistent with the fundamental canons of construction and in accordance with plain meaning approach to interpreting tariffs utilized by this Court in *United States Steel Corp.*, and *Neary v. Public Utility Commission*, 78 Pa.Cmwlth. 636, 468 A.2d 520 (1983).

PPL asserts that the Commission should have ignored the plain language. It maintains that the Commission should have examined the behind-the-scene reasons PPL requested the rate changes and tariff supplements before it declared the tariff ambiguous. PPL maintains that the alleged clarity of the tariff language should not have precluded an analysis of the nature and purpose of the tariff. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1012, fn. 3 (3d Cir.1980).

Specifically, PPL contends for purposes of determining the meaning of the phrase "twelve month average of each customer's monthly Maximum On-peak Demand" the Commission should have considered that the 500 MW cap on interruptible service was designed by PPL to produce approximately 300 to 350 MW of coincident interruptible load which was the level of interruption that would be useful for load management without excess erosion of revenue. PPL contends that the Commission failed to consider this and instead adopted the plain meaning of the phrase "twelve month average" which favored and protected the interests of its competitors. PPL makes the same argument with respect to the Commission's interpretation of the fourth sentence of the IDI Rider which provided that PPL "may change the base period Billing KW and kilowatt-hours to reflect normal usage." PPL asserts that the Commission should have ignored the plain language and instead considered that the IDI Rider was initially approved by the Commission for the express purpose of promoting future expansions of industrial customers' production facilities with resulting increases in usage of electricity.

This Court disagrees with PPL's approach for several reasons. First, the Third Circuit Court of Appeals in *Mellon Bank* did not hold that a court must *always* consider extrinsic evidence when deciphering the meaning of a contract. Rather, the court held that if a reasonable alternative interpretation is suggested, "external signs and objective indicia" may be considered in determining whether ambiguity exists. *Mellon Bank*, 619 F.2d at 1011. The Third Circuit Court of Appeals further held that "although extrinsic evidence may be considered under proper circumstances, *the parties remain bound by the appropriate objective definition of the words they use to express their intent.*" *Id.* (Emphasis added). Finally, *there is no reason for a court to consider seriously a complaint or argument which seeks to mischaracterize an agreement. See e.g., East Crossroads Center, Inc. v. Mellon–Stuart Company*, 416 Pa. 229, 205 A.2d 865 (1965).

Here, Complainants assert, and the Commission agreed, that PPL did not offer a reasonable alternative interpretation that would warrant the need to examine extrinsic evidence. Rather, PPL attempted to convince the Commission, the agency which approved the language in the first instance, that it actually meant the direct opposite of the written provisions. For example, PPL argued that the term "twelve month average of each customer's Maximum On-peak Demand", which was specifically defined in PPL's tariff, had two

separate meanings on the same page. In essence, PPL asked the Commission to put aside its own specialized knowledge of the historical, economic and policy factors which underlie rate schedules in electric utility tariffs and disregard the plain meaning of the tariff language. The Commission did not err in declining to do so.

Moreover, as the Commission pertinently pointed out, Section 1303 of the Code, 66 Pa.C.S. § 1303 provides "The rates specified in such tariffs shall be the lawful rates of such public utility until changed, as provided in this part." The Commission interpreted this section of the Code to mean that, without regard to what the utility may have intended, the utility is required to apply the language in the existing tariff as approved by the Commission. In other words, if the tariff is clear, then the utility must apply it uniformly to its customers. This Court agrees entirely with the Commission.

■ A tariff is a set of operating rules imposed by the State that a public utility must follow if it wishes to provide services to customers. It is a public document which sets forth the schedule of rates and services and rules, regulations and practices regarding those services. It is well settled that public utility tariffs must be applied consistently with their language. 66 Pa.C.S. § 1303. Public utility tariffs have the force and effect of law, and are binding on the customer as well as the utility. *Pennsylvania Electric Co. v. Pennsylvania Public Utility Commission,* 663 A.2d 281, 284 (Pa.Cmwlth.1995).

One of the purposes of the tariff system is to inform the public of a public utility's rates. Publication of a utility's tariffs is an essential part of the Public Utility Code's "great purpose." *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission,* 808 A.2d 1044, 1056, fn. 16 (Pa.Cmwlth.2002). Public utilities are required to keep copies of such tariffs open to public inspection.[12] They are also required under PUC regulations to set forth in the tariff, "definitions of technical terms and abbreviations used in the tariff, the meanings of which are not common knowledge and cannot be gathered exactly from the context in which used." 52 Pa.Code § 53.25. Legally, PPL's rationale is contrary to the vital function of the tariff system because the utility's customers and the public would be required to look beyond the plain language of the tariff to understand it.

The Commission applied the correct principles when it interpreted the language of PPL's tariff. It first looked to the language and considered the proffer of the parties who disputed its meaning. The Commission, using its vast experience in the interpretation of the language contained in electric utility tariffs, determined that no ambiguity existed. Whether the Commission's interpretation is supported, both factually and legally, is a separate issue which is addressed below.

PPL nevertheless asserts that the Commission inadvertently applied the rules of statutory construction when it interpreted

---

12. Section 1302 of the Code states in relevant part:

[E]very public utility shall file with the commission, within such time and in such form as the commission may designate, tariffs showing all rates established by it and collected or enforced, or to be collected or enforced, within the jurisdiction of the commission.... *Every public utility shall keep*

*copies of such tariffs open to public inspection under such rules and regulations as the commission may prescribe.* One copy of any rate filing shall be made available, at a convenient location and for a reasonable length of time within each of the utilities' service areas, for inspection and study by customers, upon request to the utility. 66 Pa.C.S. § 1302 (Emphasis added).

the tariff. This Court does not agree. PPL acknowledges that when interpreting statutes, a court will not consider outside evidence of a statute's meaning if its language is clear.[13] PPL contends, however, that a tariff is not a statute. Therefore, rules of statutory interpretation do not apply.

■ Although our courts have held that a tariff is not a statute enacted by the legislature for purposes of determining the legal rate of post-judgment interest, *Equitable Gas Co. v. Wade*, 812 A.2d 715 (Pa.Super.2002), a tariff, like a statute, must be construed so as to give effect to all of its terms, and when the words are clear and free from ambiguity, they are not to be disregarded under the pretext of pursuing its spirit. These tenets have also been applied in the construction and interpretation of regulations[14], ordinances[15] and resolutions[16]. The Commission's analysis of PPL's tariff was not improper because it bore the same underpinnings as found in the Statutory Construction Act.

Finally, this Court disagrees with PPL's contention that the Commission's "four corners approach" was inconsistent with the doctrine of primary jurisdiction. As stated previously, it is the Commission that has the expertise to examine and interpret tariff language and the Commission is in the best position to know if there is an ambiguity. Here, the Commission's analysis was not just an "exercise in semantics" as PPL contends. A reading of the Commission's comprehensive order makes clear that the Commission correctly applied a plain meaning analysis and utilized its expertise and experience in interpreting PPL's tariff.

■ In sum, this Court finds that when a tariff is plain on its face, the Commission need not and cannot look beyond the four corners of the tariff to determine its meaning. The intent of the parties comes into play only if and when the Commission, applying its expertise, determines that the tariff is ambiguous. When a tariff is ambiguous, the Commission may look to extrinsic evidence to determine the intention of the parties and the meaning of the tariff. Contrary to PPL Electric's position, extrinsic evidence should not be used to *create* an ambiguity.

The Commission did not err in overruling PPL's exception to the ALJ's method

---

**13.** Section 1921 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S.A. § 1921, provides:

(a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.
(b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.
(c) When the words of the statute are not explicit, the intention of the General Assembly may be ascertained by considering, among other matters:
(1) The occasion and necessity for the statute.
(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.
(4) The object to be attained.
(5) The former law, if any, including other statutes upon the same or similar subjects.
(6) The consequences of a particular interpretation.
(7) The contemporaneous legislative history.
(8) Legislative and administrative interpretations of such statute.

**14.** *Com., Dept. of Environmental Resources v. Rannels*, 148 Pa.Cmwlth. 182, 610 A.2d 513, (1992).

**15.** *Bailey v. Zoning Bd. of Adjustment of City of Philadelphia*, 569 Pa. 147, 801 A.2d 492, (2002).

**16.** *Rachael v. Forest Hills School Dist.*, 94 Pa.Cmwlth. 130, 503 A.2d 472, (1986).

of interpreting the disputed tariff language.

## II.

### Whether PPL's Termination of an Interruptible Service Contract Prior to the Expiration of the Initial One-Year Term Violated its Tariff?

In its second issue, PPL asserts that the Commission erred by concluding that PPL was not authorized, by mutual agreement, to prematurely release a customer, A & E Products, from the customer's commitment to receive interruptible service for a minimum period of one year because interruptible service was not compatible with its operations.

∎ PPL offers a number of arguments in support of its objection. Initially, PPL concedes that its tariff required its customers to enter into interruptible service contracts for an initial minimum term of one year. According to PPL the *purpose* of this provision was to protect PPL and its firm service customers from price shopping customers who might try to obtain cheaper interruptible rates then switch to firm service during seasonably riskier peak times. In the case of A & E Products, the release occurred after the summer months when the risk of interruption was the greatest.[17] Therefore, the customer did not attempt to "game" the system by switching onto interruptible service when the risk was low and then switching back to firm service when the risk was high. PPL also argues that the termination of the contract at six months benefited PPL, the customer, and other customers because the customer who left interruptible service and returned to firm service had to bear a larger proportion of

PPL's revenue requirement, thereby reducing the revenue requirement to be borne by other customers.

PPL contends that there was no unreasonable preference given to A & E Products because the customer was moved from a lower rate to a higher one. Finally, PPL claims that it did not violate its tariff because there is nothing in its tariff or the Code which precluded two parties from privately agreeing to terminate the contract upon agreement. This Court must disagree.

The Commission correctly determined that PPL's release of A & E Products was not permitted based upon the clear language of the tariff which expressly stated that the contract period was "[n]ot less than one year." In support thereof, the Commission properly relied on Section 1303 of the Code, 66 Pa.C.S. § 1303 which simply and straightforwardly does not permit PPL to deviate from its approved tariff language. This Court has affirmed the Commission's determination that an industrial customer of West Penn Power was bound by the one-year minimum notice provision of West Penn Power's filed tariff, despite the fact that the tariff rate in question was no longer the most advantageous available. This Court specifically held that a public utility and its customer may not alter the duration of a tariff that is mandated by the tariff language. *Brockway Glass Co. v. Public Utility Commission*, 63 Pa.Cmwlth. 238, 437 A.2d 1067 (1981).

The fact that the change in service here was by mutual consent does not trump such an unambiguous provision. As the Commission pointed out, while it may be true that parties may mutually agree to

---

**17.** According to Krall "during the summer *and winter months* interruptions are more likely." Pre-filed Testimony of Douglas A. Krall at 21–22; R.R. at 327a–328a. (Emphasis added).

terminate a contract, parties may not agree to violate or disregard a filed tariff. Deviation from an approved tariff is not permitted under any pretext. *Philadelphia Suburban Water Company*, 808 A.2d at 1054–1055; *West Penn Power Company v. Pennsylvania Public Utility Commission*, 147 Pa.Cmwlth. 6, 607 A.2d 1132 (1992).

Accordingly, the Commission did not err when it overruled PPL's exception on this ground.

### III.

### *Whether PPL's Application of its IDI Rider Violated its Tariff?*

Next, PPL objects to the Commission's interpretation of the fourth sentence in the IDI Rider because its interpretation "provided for substantial rate discounts for *past* expansion" and frustrated the purpose of the IDI Rider. PPL contends that the Commission's interpretation was wrong because the phrase "expected normal usage" has a temporal connotation and clearly refers to a prospective period.

■ As noted above, where the Commission makes a finding or determination which is within its discretion, this Court will not disturb it except for an error of law, lack of evidence to support the findings, or a violation of constitutional rights. This Court will not substitute its discretion for the discretion properly exercised by the Commission. *West Penn Power Co.; Philadelphia Suburban Water Co.* Applying these principles to the present controversy, this Court believes the Commission's interpretation of the language at issue is entitled to deference.

First, the ALJ held, and the Commission agreed, that the disputed language revealed no ambiguity which required an in-depth analysis of PPL's intent. The ALJ noted that to give effect to PPL's interpretation would require the Commission to ignore the plain language of the tariff. The ALJ offered the following convincing example of how the tariff, as written, should apply:

Assume there are two industrial customers which are served by the same electric substation. Customer A has been in operation since 1981. Customer A has a cyclical business pattern which builds to a peak energy usage in July and August and tapers to a lower usage in December and January. In addition, Customer A has exhibited a second pattern of increasing business annually and has steadily shown increasing energy usage as the years pass. Customer B has been in operation since April 15, 1991. Customer B has a flat energy usage pattern and has shown no increase in energy usage over the years.

If both customers applied for the IDI Rider in 2001, the tariff defined their base periods as follows: According to the first sentence of the tariff, Customer A would have a base period which started January 1, 1991, and ended December 31, 1991, ie. calendar year 1991. According to the second sentence of the tariff, Customer B would have a base period which started May 1, 1991, and ended April 30, 1992. If severe weather damaged the common substation on June 1, 1991, and both customers were out of service for the period of June 1 through June 15, 1991, the last sentence of the tariff would give PPL the right to adjust the usage data for the month of June 1991. The adjustment to the base period would be allowed because an aberration occurred in June 1991 which distorted the base period. A proxy for the June 1991 data would be needed. A reasonable solution for Customer A would be to select a number between the recorded usage for June 1990 and for

June 1992. A reasonable number for Customer B would be any usage recorded for any normal month in its billing history.

ALJ Decision, at 38.

According to PPL, it had the discretion to choose a customer's base period if, in its opinion, usage during any billing month was not representative of the customer's expected (meaning upcoming in the future) normal usage pattern. PPL argued that the intention of the IDI Rider was to recognize increased production or increased plant size *after* the customers applied for the IDI Rider rate. Krall testified that if a customer requested to be billed under the IDI Rider, the customer's most recent annual use would be examined to see if that use was materially different from the annual period ending December 31, 1991. If a change was noted, then the base period would be chosen to reflect current conditions. Pre-filed Testimony of Douglas A. Krall at 20; R.R. at 326a. In other words, despite the clearly delineated exceptions to using December 31, 1991, as the default base period, PPL asserted that it was authorized to calculate the rate benefit based upon any base period it selected if it determined that there were months in the specified billing period that did not represent normal usage. For example, if selecting 1991 as a base period would give the customer a discount for past production increases or plant expansions, PPL could chose not to select 1991 as the base year.

This Court agrees with the Commission that the tariff as approved was not ambiguous and clearly provided otherwise. According to the plain language, the first three sentences deal with creating a base period for the customer. The fourth sentence concerns PPL's perception of the customer's expected normal usage pattern in the already designated base period (as determined in one of the prior three sentences). PPL had the limited discretion to change the customer's data for the base period to reflect normal usage (for example, if an anomaly occurred), not to choose an altogether different base period than the tariff called for.

This Court discerns no error.

## IV.

### *Whether PPL's Calculation of the 500 MW Cap Violated its Tariff?*

The next objection lodged by PPL is that the Commission erred in refusing to consider the reasons for the 500 MW cap. Specifically, PPL maintains that the Commission's interpretation of the tariff failed to take into consideration that the "averaging" method results in larger interruptible loads and additional erosion of revenues. As discussed previously, the Commission correctly applied a plain language analysis and, so long as its interpretation is reasonable, this Court must defer to that interpretation.

■■ First, the Commission quite correctly noted that to give effect to PPL's interpretation would require this Court to read the phrase "twelve month average of each customer's monthly Maximum On-peak Demand", which appears twice in the tariff, as having two different meanings. In one case, "twelve month average of each customer's monthly Maximum On-peak Demand" would refer to the "highest" annual 15–minute period of maximum power use per customer for purposes of calculating the 500 MW cap. In the next, "twelve month average of each customer's monthly Maximum On-peak Demand" would be defined as a monthly average of On-peak Demands and be restricted to the monthly billing periods (i.e., not applicable to the calculation of the 500 MW cap). The Commission's reading, on the other hand, ascribes to the phrase "twelve month average of each customer's monthly Maxi-

mum On-peak Demand" its ordinary meaning, and applies that meaning consistently with the definition contained in the tariff. Further, this Court agrees with the Commission that PPL's reading of the tariff renders superfluous the term "monthly" which is antecedent to "Maximum On-peak demand." The Commission's interpretation, on the other hand, gives meaning to this term.

Finally, the Commission's reading gives effect and meaning to each provision of the tariff. The tariff provides that "[f]or the purpose of determining this amount [500 MW] interruptible power is the *twelve month average* of each customer's monthly Maximum On-peak Demand...." Under the Commission's reading, "twelve month average" means totaling up the customer's Maximum On-peak Demands and averaging them. That is, dividing that number by twelve. PPL, on the other hand, argues that "twelve month average" means the customer's *single highest* Maximum On-peak value *over a twelve month period*. PPL's reading of "twelve month average" leads to a disfavored construction of the tariff, rendering the term "average" mere surplusage.

This Court believes that the Commission's interpretation of the tariff language at issue was rationally based and reasonable, and is entitled to deference. The Commission did not err when it overruled PPL's exception on this ground.

## V.

***Whether Section 1502 of the Public Utility Code, 66 Pa.C.S. § 1502, Applies to Tax Auditing Services Unrelated to Public Utility Service?*** [18]

Next, PPL contends that the Commission erred when it found that PPL violated Section 1502 of the Code, 66 Pa.C.S. § 1502, by introducing certain of its industrial customers to Spectrum and UMC, its unregulated affiliates. PPL asserts that a referral to Spectrum and UMC for state sales tax audits and counseling was not a "public utility service" and was, therefore, not subject to the provisions of the Code or the Commission's jurisdiction.

The Commission, based on the evidence, adopted the ALJ's conclusion that the crucial aspect in the arrangement was the involvement of PPL's account managers. Section 1502 prohibits providing "unreasonable advantage" in "service" to any "corporation." The Commission found that the definition of "service" is applicable in the broadest sense, and encompassed the sales tax auditing services PPL provided through its participation in the joint venture.

Specifically, PPL's account managers acquired confidential knowledge of their customer's billing and usage data as part of their duties for PPL. After acquiring this information, they used it to benefit Spectrum and a consulting firm, UMC, and no other energy consultant. The Commission concluded, without elaboration, that this constituted illegal "cross-subsidization."

What this Court gathers the Commission meant is that PPL's regulated operations, through its account managers, subsidized or supported, at the expense of the ratepayers, the operations of its unregulated affiliates. Cross-subsidization is, in large, prohibited because there exists the potential for unfair competition and harm to ratepayers. In theory, the arrangement between PPL, UMC and Spectrum could

18. This Court has addressed PPL's sixth issue regarding discrimination in its disposition of issue V.

result in PPL's customers in the regulated market being overcharged for their electricity because they are paying the cost of the subsidy of the unregulated services provided by Spectrum and UMC. The concern of the Commission was twofold: (1) Spectrum and UMC could gain an improper advantage over their competitors (including Complainants) because the cross-subsidy enabled them to provide the unregulated service below actual cost; and (2) an improper assignment of costs between PPL and the joint venture could potentially burden PPL's ratepayers.

■ The import of the Commission's holding was to prohibit PPL from providing *non-utility services* in a manner that advanced the possibility of cross-subsidization or unfair competitive advantage. The inquiry then is whether the propriety of PPL's dealings with its unregulated affiliates and participation in the joint venture was beyond the scope of the Code and jurisdiction of the Commission to decide, and if not, whether it falls under the prohibitions of Section 1502.

First, this Court does not agree with PPL that the subject matter of its participation in the joint venture and its dealings with Spectrum and UMC, through its account managers, was beyond the Commission's jurisdiction. This Court must agree that PPL's provision of confidential customer information to Spectrum and UMC violated the Code and justified the Commissions cease and desist order. This Court does not believe, however, that PPL's conduct constituted a violation of Section 1502 of the Code, 66 Pa.C.S. § 1502.

As previously pointed out, Section 1502 of the Code is entitled "Discrimination in service." It provides that: "No public utility shall, as to service, make or grant any unreasonable preference or advantage" and further prohibits a public utility from

establishing or maintaining "any unreasonable difference as to service, either as between localities or as between classes of service." 66 Pa.C.S. § 1502. (Emphasis added).

The protection of an energy consultant's economic interests and competitive position, and of those similarly situated, was neither an objective of Section 1502 nor of the regulatory scheme of the Code in general. *See Crown American Corporation v. Pennsylvania Public Utility Commission,* 76 Pa.Cmwlth. 305, 463 A.2d 1257 (1983); *See also Pennsylvania Petroleum Association v. Pennsylvania Power & Light Company,* 488 Pa. 308, 412 A.2d 522 (1980) (applying this same principle to Section 1304 of the Code). Our courts have recognized that a fundamental duty of the Commission, assigned by the Legislature, is the protection of the public and the ratepayers. Although the Code is undeniably concerned with fostering competition, its scope and reach does not extend to fostering competition between unregulated affiliates.

Here, the issue did not involve a *public utility service,* which would bring it within Section 1502. Rather, the dispute over the customer information involves PPL's disclosure of customer information for the purposes of securing an advantage as a participant in a joint venture which, in turn, supplied *consulting services* for profit. Section 1502, by its plain language, prohibits preferential and discriminatory activities that have to do with service classifications *for consumers.* Section 1502 protects *customers* of a public utility from being subjected to unreasonable discrimination or preferences concerning the establishment of different services for different classes of customers. In order to come within Section 1502, the conduct must relate to *the public service* the utility provides to its customers and the public.

Complainants complain that PPL has discriminated against *them* because their conduct allegedly impacted Complainants' ability to compete. Complainants, however, were not customers or ratepayers. They provided consulting services to industrial ratepayers. Therefore, this Court does not agree with the Commission that this is the type of discrimination or preferential treatment addressed by Section 1502.

Nevertheless, this Court finds that the Commission's cease and desist order was within its discretion and jurisdiction and was legally supported on other grounds.

It is well settled that the Commission has jurisdiction over matters relating to "the reasonableness of a utility's services, facilities and rates, as well as over matters concerning the utility's formation of reasonable rules and regulations governing the conditions under which service, facilities and rates shall be rendered, constructed or imposed." *DiSanto v. Dauphin Consolidated Water Supply Company*, 291 Pa.Super. 440, 436 A.2d 197, 201 (1981).

■ In the present controversy, the ALJ and Commission considered evidence regarding PPL's contribution of its account managers to support the non-utility related business venture. PPL's use of the same personnel to serve both its regulated and its unregulated activities understandably caused the Commission to be concerned about the potential cross subsidies which would have an unfavorable effect on PPL's rates. The Commission's concern was well founded and this Court will not substitute its judgment for that of the Commission. As the United States District Court for the District of Columbia explained in *United States v. Western Elec. Co., Inc.*, 592 F.Supp. 846, 853 (D.D.C.1984):

> As long as [a public utility] is engaged in both monopoly and competitive activi-

ties, it will have the incentive as well as the ability to 'milk' the rate-of-return regulated monopoly affiliate to subsidize its competitive ventures and thereby to undersell its rivals in the markets where there is competition ... To the extent that [the public utility] used the same facilities, equipment, and personnel to serve both its regulated and its unregulated activities, it would have the ability to overallocate the costs assigned to the former in order to maximize the amount that would be passed on to the ratepayers (who have no choice but to pay). Not only would this improper assignment of costs burden the rate payers; it would also enable the company profitably to charge less for its competitive products and services than do its rivals who enjoy no such subsidy.

*United States*, 592 F.Supp. at 853.

Additionally, among other powers, the Commission has authority to review and modify *any* contract entered into by a public utility. The Commission has the broad and flexible authority to find that a contract's terms are "unjust, unreasonable, inequitable, or otherwise contrary or adverse to public interest ..." 66 Pa.C.S. § 508. Further, prior written approval is needed for a valid and effective contract or arrangement between a public utility and an affiliated interest for the furnishing of management, supervisory, construction, engineering, accounting, legal, financial, or similar services, or for the purchase, sale, lease, or exchange of any property, right, or thing or for the furnishing of any other service, property, right or thing. 66 Pa. C.S. § 2102(a). The Commission has *continuing* supervision and jurisdiction over such contracts. 66 Pa.C.S. § 2103.

Here, the Commission acted pursuant to its power and its statutory obligation to ensure that PPL does not engage in activi-

ties that could impair PPL's ability to set just and reasonable rates. Where a public utility, by agreement with an unregulated affiliate, agrees to engage in a practice which has the potential or tendency to affect the cost of generating electricity, then it is within the Commission's jurisdiction to oversee. This Court finds that the Commission's need to regulate non-utility services such as those performed by PPL pursuant to the joint venture agreement was justified where it protected ratepayers from abuse, a legitimate regulatory purpose under the Code. This Court further concurs with the Commission that PPL's provision of confidential customer information to Spectrum and UMC pursuant to its joint venture agreement produced a potentially harmful effect on ratepayers which fully justified the Commission's order.

Accordingly, the order of the Commission which dismissed PPL's exceptions to the ALJ's Initial Decision is affirmed.

### ORDER

AND NOW, this 6th day of December, 2006, the order of the Pennsylvania Public Utility Commission in the above-captioned case is hereby affirmed.